GRIMES v. GOODMAN DRILLING CO. et al.
(No. 9213.)

(Court of Civil Appeals of Texas. Ft. Worth.
June 14, 1919. Rehearing Denied
Oct. 18, 1919.)

1. MINES AND MINERALS ⊂=⊃78(1) — NUMBER
OF WELLS PERMISSIBLE UNDER OIL AND GAS
LEASE.

Under written oil and gas lease between
lot owners and trustees of oil company, trustee lessees *held* not precluded from drilling
more than one well on the lots, or from drilling as many wells as appeared reasonably necessary to develop the land for oil and gas, provided the drilling of any subsequent wells would
not necessitate the removal of any of the houses on the land when the lease contract was
made.

2. MINES AND MINERALS ⊂=⊃74—PURCHASE OF
LOTS SUBJECT TO OIL AND GAS LEASE.

In purchasing the surface rights of land
from lessors of the oil and gas rights to a company and its trustees, plaintiff must be presumed to have known that the trustee lessees
had the right to sink a well on his lot, and that
thereby he and his family, if in occupancy,
would be inconvenienced and perhaps endangered during drilling.

3. MINES AND MINERALS ⊂=⊃74—PURCHASE OF
SURFACE SUBJECT TO TERMS OF OIL AND GAS
LEASE.

Where plaintiff purchased the surface
rights of a lot burdened with the terms of an
oil and gas lease, he cannot complain of conditions produced by the trustee lessees and others such as are usual and customary during the
drilling of an oil well.

Appeal from District Court, Wichita County; Edgar Scurry, Judge.

Suit by Ottis Grimes against the Goodman
Drilling Company and others. From judgment for defendants, plaintiff appeals. Affirmed.

W. D. Cardwell and Warren J. Dale, both
of Burkburnett, for appellant.

Carrigan, Britain & Morgan and, Bert
King, all of Wichita Falls, for appellees.

BUCK, J. This is an appeal from an order and judgment of the Seventy-Eighth district court of Wichita county denying plaintiff, Ottis Grimes, an injunctive writ against
the Goodman Drilling Company et al. Plaintiff alleged that he was the owner in fee of
lot 6, block 6, in the town of Burkburnett.
The evidence shows that on and prior to
August 20, 1918, H. L. Bunstine and wife
owned lot 6 in said block, and that other parties owned other lots in the same block, and
on said date the owners entered into a written oil and gas lease with the trustees of the
Block Six Oil Company, an unincorporated
oil association. This contract contains the
following provisions, to wit:

"Whereas, all of the owners above named
desire to pool all of their interests in the lots
above described for the purpose of having an
oil or gas well drilled on one of the lots or
tracts of land above mentioned, said well to be
drilled on any portion of either of said lots, the
location of said well to be selected by the
lessees herein. * * *

"That the lessors in consideration of the
sum of thirty thousand dollars to them in hand
paid by the lessees, the receipt of which is,
hereby acknowledged as well as in consideration
of the covenants and agreements hereinafter
contained on the part of the lessees, do hereby grant, sell, convey and lease unto the lessees in trust for said oil company all of the oil
and gas in and under the above described tracts
of land, and the possession thereof for the
purpose of entering upon and operating thereon, and removing therefrom said oil and gas,
* * * to operate said property with the
right of ingress and egress at all times for such
purposes, and rights and privileges therefor.
* * * To have and to hold the same for a
term of three years and as much longer thereafter as oil or gas is found thereon and therein in paying quantities, provided a well herein
mentioned shall be drilled in compliance with
this contract. * * *

"Lessees agree to begin the actual drilling of
a well upon some portion of said lots within
sixty days from the date hereof, and when said
well is once commenced, the drilling thereof
shall be prosecuted with due diligence until
same is completed, said well to be drilled to a
depth of 2000 feet unless oil or gas is obtained
at a less depth in paying quantities.

"In the event lessees should fail to commence
the drilling of said well in compliance with this
contract, then this lease shall terminate.
* * *

"It is agreed by all the parties hereto that
the drilling of one well upon any portion of
any of said lots, the location thereof to be
made by the lessees, shall be a complete fulfillment of this contract and will be sufficient to
hold the lease upon all of said lots, provided
that none of the residences now located on
said lots shall be removed therefrom."

The evidence further shows that about
March, 1919, plaintiff bought from Bunstine
and wife said lot 6, subject to the oil and
gas lease above set out; the grantors retaining the interest held by them in the royalties. At this time two wells had been
drilled on the block, "one on each half
block," but no well had been started on lot
6. On or about April 7, 1919, the Goodman
Drilling Company, drilling for the Block Six
Oil Company or its assignee, began to erect
a derrick and take other steps to drill a well
on plaintiff's lot, and the front part thereof.
No permission was asked of plaintiff and no
compensation was paid or offered him to drill
the well on his lot, but the same was done
over his protest; the lessees claiming the
right to sink a well on his place under
their contract with Bunstine and other lessors.

⊂=⊃For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

The evidence shows that the derrick in question is a structure 96 feet high, with guy or stay wires extending out to make it secure, and each attached to a buried timber called a "dead man"; the distance from the dead man to the center of the base of the derrick being equal to the distance from the ground to the point of attachment of the wire to the derrick. Ordinarily, there are three sets of four each of these wires; the wires being attached to the four corners of the derrick. Owing to the fact that it was impracticable to run the wires across the street in front of plaintiff's house, the wires on that side of the derrick did not extend the usual distance. The evidence further shows that on top of the derrick are heavy tools and appliances, four casing pulleys, weighing approximately 200 pounds each, and the crown block weighing approximately 500 pounds. There are derricks all over the town of Burkburnett, and that during a recent windstorm a number of them blew down. The slush pit connected with the well is near to and runs along the side of plaintiff's house, and slush spatters therefrom onto the sides of the house, the doors, and windows, and necessitates that side of the house being closed up. The running of the engine is very objectionable to the plaintiff's family and often prevents their sleeping at nights, and is so loud as to require them in ordinary conversation to speak in very loud tones. The evidence shows that conditions about this well, the noise, the slush, the grease, etc., are similar to conditions prevailing around oil wells generally; that plaintiff has continued with his wife to occupy the premises, though he has suffered great inconvenience and has been disturbed considerably in the use of the premises.

Without passing for the present upon the question of whether or not the evidence shows that the defendant has exercised ordinary care in the construction of the derrick and has exercised such care in the drilling of the well, we will consider the vital question of whether or not the lessees, under the contract made with plaintiff's grantor and others, have authority to go upon plaintiff's premises for the purpose of sinking a well and taking other steps toward developing the land for oil and gas. Appellant contends that, under the terms of the contract of the lease, the lessees were restricted to the drilling of one well. Appellant cites Thornton on Oil and Gas (2d Ed.) § 91, p. 129, which, in part, reads as follows:

"There is also an implied covenant on the part of the lessee that he will put down enough wells to protect the leased premises from being drained by wells on adjacent territory. If, however, the lease specifies the number of wells that are to be drilled, there is no implied covenant that more than the number specified are to be drilled, even though more are needed to fully develop the territory, or to protect the premises from wells on adjoining territory."

Here the author is discussing the question of the lessee's implied covenant duty. One of the considerations moving from the lessees in the instant case was the sinking of a well to a depth of 2,000 feet, unless oil or gas should be obtained at a less depth. The subsequent provision in the contract, to the effect that it is agreed by all parties that the drilling of one well upon any portion of any of said lots shall be a complete fulfillment of this contract, is a stipulation for the benefit of the lessees, and not for the benefit of the lessors, except that portion of said paragraph that provides "that none of the residences now located on said lots shall be removed therefrom" may be said to be a provision for the benefit of the lessors, and to require that the lessees prosecute their operations and drilling so as not to require the removal of any of said houses. To support his contention, appellant cites the following authorities: Colgan v. Forest City Oil Co., 194 Pa. 234, 45 Atl. 119, 74 Am. St. Rep. 695; Brewster v. Lanyon Zinc Co., 140 Fed. 801, 72 C. C. A. 213; Aye et al. v. Phila. Co., 193 Pa. 451, 44 Atl. 555, 74 Am. St. Rep. 696; Stoddard v. Emery, 128 Pa. 436, 18 Atl. 339; Harris v. Ohio Oil Co., 57 Ohio St. 118, 48 N. E. 502. We have examined all of these authorities and find that they are in harmony with our conclusion heretofore expressed. For instance, it is said in Colgan v. Oil Co., supra, quoting from the syllabus (45 Atl. 119):

"A lessee of oil lands, who has expressly covenanted only to put down one oil well on the premises, and who has put down several on one side of the lands, cannot be compelled, under any implied covenant, to put down a well on the other half, or to surrender such half, unless it is clearly shown that he is not acting in good faith on his business judgment, but fraudulently with an intention to obtain a dishonest advantage."

In Aye v. Phila. Co., supra, it was held that where the parties to a lease of oil land provide for a test well, and what shall be done if it produces oil in paying quantities, but make no provision if the well proves dry, there is an implied obligation on the part of the lessee, in the event the test well proves dry, to proceed with the exploration with reasonable diligence, according to the usual course of the business. To the same effect is Stoddard v. Emery, supra. It was held that, where a lease provides for the drilling of one oil well in eight months and a second at a time not specified, there was no implied covenant to drill wells as often as customary, in the absence of an expressed contract.

The evidence shows from plaintiff's own testimony that there are several wells across the street from plaintiff's home where the well in question is located, and that his lot

is practically surrounded by oil wells which are taking the oil from underneath his lot, and that, if the drilling of this well should be held up for 60 days, these other wells would take a considerable quantity of any oil which might be under plaintiff's lot. Plaintiff further testified that he paid $1,300 for the lot and improvements and did not get the royalty, but only purchased the surface right; that he knew that the block was leased for oil and gas purposes when he bought the lot; that he was a tool dresser and familiar with the nature of oil derricks, and of the noises that the drilling of an oil well carries with it, and was so acquainted at the time he bought the house; that he knew that practically every block in Burkburnett was being drilled for oil, and gas; that he had read the lease contract between the Block Six Oil Company and the owners of the several lots in block 6.

[1, 2] We conclude that under the written contract the lessees were not precluded from drilling more than one well, or from drilling as many wells as appeared reasonably necessary to develop the land for oil and gas, provided the drilling of any subsequent wells would not necessitate the removal of any of the houses on the land at the time the lease contract was made. The plaintiff in this case had no interest in the development of the block for oil, but his grantor, who still owns his pro rata part of the royalty, did have such interest, and the other lessors and lessees and their assignees have an interest in the development of said territory to the fullest extent for oil and gas. In purchasing the lot, as we think, plaintiff must be presumed to have known that the lessees had the right to sink a well on his lot, and that thereby he and his family, if occupying the premises, would be subjected to more or less inconvenience and perhaps some danger while said drilling was going on. But he bought the premises so burdened, and has no just ground for complaint by reason of the entry upon his premises and the drilling of the well.

[3] But appellant further urges that he is entitled to an abatement of the nuisance created by appellees on his property, in the erection and maintenance of the derrick on his premises in a dangerous condition, so as to endanger the life and limb of appellant and his household, and by placing the engine, boiler, and slush pit to such close proximity to appellant's house as to be a source of great danger from fire and also a great source of annoyance and inconvenience to his family and property. As appellant purchased the premises burdened with the terms of the lease, he is in no position to complain of conditions produced by appellees, such as are usual and customary during the drilling of an oil well. If he is presumed to have known, as we think he is, that the lessees had the right to sink a well on lot 6 of the block, he is further presumed to have known that conditions would naturally arise during the drilling of said well which would make the use of the premises as a home disagreeable, inconvenient, and perhaps dangerous. Appellant must have known that in the drilling of a well a derrick was essential, and that it would be necessary to have an engine and boiler placed on the lot and a slush pit. While the slush pit is shown to be close to appellant's house, there is no evidence that appellees were negligent in placing it there, or that it could be placed elsewhere on the lot and still perform the purposes for which it is designed. The evidence shows that the boiler was placed close to a door of a stormhouse on said premises that appellant used as a bedroom, and that, when complaint was made that the door to the stormhouse could not be opened by reason of the proximity of the boiler, the boiler was moved so that the door could be opened. The location of the well in the front part of the lot, rather than in the back part, seems to have been justified by reason of the fact that another well across the street would have a tendency to draw the oil from under the street and from under the front part of plaintiff's lot. While plaintiff's witness Foote testified as to some alleged defect in the placing of the guy wires supporting the derrick, the defendant Goodman also testified that he had used the same means of protection and precaution in preparing to drill this well; that he had built derricks in this field and had built 300 or 400 in other fields; and that he thought the derrick was sufficiently guyed to make it safe. Under the circumstances, we think the trial court was justified in denying the temporary writ as prayed for, and the judgment of the trial court is hereby affirmed.

Judgment affirmed.