No. 25,171.

J. E. HAMILTON, *Appellee*, v. THE EMPIRE GAS AND FUEL COMPANY, *Appellant*.

J. L. SHRIVER, *Appellee*, v. THE EMPIRE GAS AND FUEL COMPANY, *Appellant*.

NANCY E. SHRIVER et al., *Appellees*, v. THE EMPIRE GAS AND FUEL COMPANY, *Appellant*.

SYLLABUS BY THE COURT.

MINES AND MINERALS—*Oil and Gas Lease—Action to Enjoin Lessee from Using Certain Method of Treating and Testing Oil to Determine the Amount of Marketable Oil Produced and Saved—Method Used Not Shown to be Inaccurate, Inefficient or Unfair to Lessor—Injunction Denied.* In a suit by the lessor of an oil and gas lease to enjoin the lessee from using a certain method of treating the oil produced so as to make it marketable and of determining the amount of oil produced and saved from the leased premises, and to require the lessee to use a method which is more expensive and wasteful than the method used, which suit is predicated upon the following clause in the lease, which obligates the lessee, "to deliver to the credit of the first party, his heirs, or assigns, free of cost, in the pipe line to which it may connect its wells, the equal one-eighth part of all oil produced and saved from the leased premises": it is *held*, that the lessor is interested primarily in results; that he should not be permitted to dictate the method employed by the lessee so long as that method is accurate, efficient, and fair to him, and if by the method used he receives credit and payment for one-eighth of all the oil produced and saved from the leased premises he has no complaint.

Appeal from Butler district court; ALLISON T. AYRES, judge. Opinion filed November 8, 1924. Reversed.

*H. O. Caster, Hayes McCoy,* and *S. N. Hawkes,* all of Bartlesville, Okla., for the appellant.

*John Madden, John Madden, Jr., Louis Nadel,* and *J. M. Burriss,* all of Wichita, for the appellees.

The opinion of the court was delivered by

HARVEY, J.: This is a suit by lessors of certain oil and gas leases to enjoin the lessee from using the "thief test" on oil in tanks on the leased premises, and from turning oil under such test into pipe lines for treatment elsewhere, and for a decree requiring defendant to use the heating and steaming plants on the leased premises before turning the oil into the pipe lines. It was tried to the court, who made

findings of fact and conclusions of law. Judgment, the nature of which will be more fully set out, was rendered for plaintiffs, and the defendant has appealed. There are three cases against the same defendant, involving three leases owned by defendant parties, but the allegations as to injuries sustained and the relief sought are identical. They were consolidated for trial in the court below and here, and may be treated as one.

The petition, after alleging that the plaintiff is the owner of the land, that a lease was executed, a copy of which is attached, and that defendant by proper assignment is now the owner and holder of the lease, recites:

"5. The defendant, The Empire Gas and Fuel Company, has drilled a number of wells on the land covered by said oil and gas lease and said wells are producing large quantities of oil. That one of the conditions of said lease is that there shall be delivered to the plaintiff free of cost in pipe line a one-eighth (⅛) part of all oil produced and saved from said premises. The condition being in words and figures as follows:

" 'To deliver to the credit of the first party, his heirs, or assigns, free of cost, in the pipe line to which it may connect its wells, the equal one-eighth part of all oil produced and saved from the leased premises.'

"6. The defendant, Empire Gas and Fuel Company, erected and maintained on said leased premises a treating or steaming plant for the purpose of treating the oil obtained from the wells drilled thereon and removing therefrom water and basic sediment before turning the same into the pipe-line connections, and said treating or steaming plants were operated for the purpose of ascertaining with some degree of accuracy the amount of merchantable oil produced from wells, and in conformity with conditions of lease aforesaid put in pipe line connecting with wells the merchantable oil, out of which the plaintiff was to receive one-eighth of oil produced and saved from the premises. That said testing or steaming plants were fairly well designed to test the production of merchantable oil, and the plaintiffs received up to the 1st of August, 1920, his checks for one-eighth, the royalty of oil turned into pipe line connecting with the wells from the treating and steaming plant.

"7. On or about the 1st of August, 1920, the defendant, the Empire Gas and Fuel Company, breached the terms and conditions of its contract of lease, as aforesaid, closed down and abandoned the use of its treating and steaming plant and resorted to another and different method, known as the 'thief test'; the 'thief' being an instrument with a cup or trap which is let down into the bottom of tank and brings up a cup of oil, then to the center and last to the top. These tests are ground out and an estimate is made therefrom of the amount of oil in each tank. By the method of estimating the plaintiff has been greatly reduced in his one-eighth royalty, the amount of his one-eighth of the production falling immediately to a lesser amount, which varies and is uncertain, and hence cannot be placed with any degree of accuracy, but as a total for each month the one-eighth interest of the plaintiff has diminished

Hamilton v. Gas and Fuel Co.

one-sixth (⅙) without there being any diminution in the production of the wells on said lease, the decrease being due to the inaccurate tests and estimates hereinbefore pleaded as the 'thief test.' In violation of the conditions of its contract of lease as aforesaid, the said defendant turned the unsteamed oil into its own pipe line and carried the same to the Boyer tank farm in Butler county, Kansas, where it treats said oil by some method unknown to the plaintiff, but well known to the defendant, thereby placing the plaintiff in a situation where he can by no system of gauging keep an account of the amount of oil produced from wells and pumped into tanks and from tanks turned into connecting pipe line. By this method the defendant has failed to account for plaintiff's royalty, and placed it beyond the reach of plaintiff to know or ascertain his rights in the premises—the amount of oil produced or turned into connecting pipe lines. As a result of this method there has been a great loss in pipe-line runs. There is no way that the plaintiff can gauge his interest or protect the same, to the plaintiff's irreparable loss and damage.

"8. That during the months of August and September and up to and including October 11th, 1920, there was in the tanks of said leased premises, pumped from the wells thereon, twenty-eight thousand two hundred twenty-three barrels of oil as shown by the gauge of said tanks, as plaintiff is informed and believes. That during said time the defendant, Empire Gas and Fuel Company, has only accounted to the plaintiff for twenty-four thousand eight hundred ten and $36/100$ (24,810.36) barrels in said tanks turned into pipe lines, thereby showing an actual loss of three thousand four hundred twelve and $64/100$ (3,412.64) barrels of oil in which the plaintiff has a one-eighth royalty interest, thereby entailing upon the plaintiff a loss of fourteen hundred ninety-three and $3/100$ dollars ($1,493.03), which would be his one-eighth of said oil as royalty at $3.50 per barrel, the standard price of said oil as published by the Prairie Oil and Gas Company.

"9. Plaintiff is informed and believes, and so alleges the fact to be, that the methods adopted by the defendant in the testing, estimating and treating of oil taken from the land of the plaintiff is unjust, inaccurate and problematical in results. The methods adopted by the defendant to produce the result as aforesaid, and consequent loss to the plaintiff of fourteen hundred ninety-three and $3/100$ dollars ($1,493.03) in two months, are not known to the plaintiff, and hence cannot be described with accuracy, but are well known to the defendant, its agents and employees. There has been no appreciable diminution in production of oil from wells. The treating and steaming plants erected by the defendant on the leased premises of the plaintiff are standing with full equipment for treating oil produced from the wells thereon. In the use of said treating and steaming plants the plaintiff was able to keep fairly accurate account of the amount of oil produced, treated and turned into pipe line. The abandonment of said treating plants by the defendant leaves the plaintiff where he can keep no account or do anything to guard his interest or protect his one-eighth royalty, and is compelled to receive, without any knowledge of amount, the figures furnished by the defendant, which figures are based upon the inaccurate tests as hereinbefore pleaded. They result in an actual loss to the plaintiff, as hereinbefore stated, of fourteen hundred ninety-three and $3/100$ dollars ($1,493.03), his share in the way of royalty in the three thousand

four hundred twelve and $^{64}/_{100}$ barrels of oil lost and unaccounted for. The plaintiff has no adequate remedy at law to protect him in damage. The methods used as aforesaid are continuing, and the plaintiff will suffer great and irreparable loss unless he can have the benefit of the equitable remedy of injunction, enjoining said defendants from pursuing their present method of measuring, testing and treating oil, and a mandatory order and decree compelling them to use their heating and steaming plant on said leased premises for treating the oil before turning into pipe line, and for the further relief of an accounting for the loss sustained."

The answer contained a general denial and averred that with the oil produced from the leases there is commingled a large percentage of water, which varies in amount, which it is necessary to separate from the oil in order to render it marketable; that defendant, without cost to plaintiff, has at all times during the operation of the lease used such methods as were from time to time approved by those skilled in the business, and has at all times delivered to plaintiff a greater amount of credit for oil than plaintiff was entitled to under the terms of the lease; that prior to March, 1919, defendant in separating the water from the oil used a steaming process, at great expense; that since that time defendant has used a dehydrating plant in the neighborhood of plaintiff's land, and from then to some time in August, 1920, in order to determine the percentage of water in the oil, defendant made use of fair and average samples of the mixture of oil and water taken from the wells, and used a process known as the "centrifuge" or grinding-out process, which was during that time the ordinary and approved process used in the oil field for that purpose, but that this process did not show the full amount of water or basic sediment commingled with the oil, and therefore during that time defendant had given credit to plaintiff for more than the share of oil due plaintiff under the terms of his lease.

Both plaintiff and defendant asked for an accounting, but this feature of the case has not been tried out and need not be further noted.

After trial, during which the court, in addition to hearing the evidence, made personal examination of the leases, the manner of taking samples, the dehydrating plant and the process of determining the amount of water in the oil, and made findings of fact that the plaintiffs were the owners of the land described, and had executed oil and gas leases in the ordinary form, containing the clause set out in plaintiffs' petition.

Hamilton v. Gas and Fuel Co.

"5. The above-described lands are situated in what is known as the El Dorado district. At the time said leases were given there was no development for or production of oil in that district.

"6. The defendant became the owner of all of said leases in the year 1916 and commenced to develop all of them in the summer of 1917, very soon after development first started in the El Dorado field.

"7. During the early development in the El Dorado field there was very little water commingled with the oil as it was produced. It was comparatively free from impurities and was marketable in the condition in which it was pumped. Later salt water came into the wells and gradually increased in volume, and during the last few years a large percentage of the fluid produced by the wells has been salt water, amounting on many leases to more than ninety per cent. This is commingled with the oil and has to be pumped out with it. The mixed fluid thus pumped out is run into a tank. Since the water is heavier than the oil, a considerable portion of it settles by gravity into the bottom of the tank and is drawn off without disturbing the oil. A large amount of water, however, remains mixed with the oil, and under ordinary temperature will not separate. It was found that by heating the mixture a still greater portion of the water, which has remained suspended in the oil, could be separated and precipitated to the bottom and again drawn off; but even when the fluid was heated the water descending carried with it considerable oil. This mixture, with such other impurities as are brought up by the pump, forms an emulsion at the bottom of the tank, which is called 'basic sediment,' or most generally 'B. S.' This B. S. gradually thickens in the bottom of the tank, and much of it has to be scraped out and thrown away, and most operators deposit it in large artificial ponds upon the leases, where occasionally it is finally disposed of by burning.

"8. Purchasing companies will not ordinarily accept oil having much more than one per cent of water and other foreign matter.

"9. [A finding as to the divisional order given by plaintiffs for the payment of oil.]

"10. The delivery of oil to the purchasing company was made in the following manner:

"A pipe line was connected with the stock tanks on the leased premises, somewhere from twelve to twenty inches above the bottom of the tank, and the oil was run through this pipe line. Before being run, an agent of the purchasing company, called the gauger, carefully measured the depth of the fluid in the tank; then the pipe-line connection was opened and the oil allowed to pass into the pipe line from the tank, and as much taken out as the purchaser was willing to accept; then the pipe line was closed and again the depth of the fluid in the tank was carefully measured, and the number of barrels and fractions of barrels run was then determined by the purchasing company. Prior to this time each tank had been carefully measured, and a very elaborate table was prepared by an expert engineer at Tulsa, employed by practically all purchasing companies for this purpose. That table showed the number of barrels of forty-two (42) gallons each that would be contained in each portion of the height of the tank, figured down to a quarter of an inch and an hundredth part of a barrel. From this table the purchasing company figures the

number of barrels delivered, and remits, at the market value, one-eighth to the royalty owner and seven-eighths to the producing company. The landowner could have an agent present to verify these measurements and keep a record of same when this is done.

"11. The first method used by the defendant in removing water from the oil, so as to make it marketable, was by establishing upon each lease a steaming plant and placing steam pipes in the tanks until the fluid was heated sufficiently so as to separate water from the oil to such an extent that the portion of the fluid above the pipe-line connection would be of such purity that the purchaser would accept it. Before the purchaser would accept it, a sample of the oil would be taken from near the pipe line connection by means of an instrument called a 'thief,' and that sample tested by the use of what is called a 'centrifuge machine.' If the sample satisfied the purchaser, he would buy the oil. If it did not, he would require further treatment.

"12. By this method the heating of the oil caused some of the lighter vapors of the oil to escape, so that there was a distinct loss in volume before the oil was sold, and there was a distinct and important loss in the quality of the oil by reason of the fact that the lighter gasoline vapors were lost and the value of the oil was consequently lessened. There was another loss also in the amount of emulsion which settled below the pipe-line connection and which would not be accepted by the purchaser, and which was thrown away, with the possibility of reclaiming only a small portion. All of these losses were suffered by the lessor and the lessee in proportion to their interests of one-eighth and seven-eighths.

"13. In addition to the above losses, the expense of this method of treatment was very substantial. The cost of constructing these separate steaming plants and maintaining and operating them was borne by the defendant, except that, as provided by the leases and as was customary in the field, the fuel for this purpose was oil taken from the lease and amounted to about ten barrels a day.

"14. Seeking to prevent the above losses and expenses, the defendant during the year 1918 undertook extensive experiments to devise a method of treating the oil in such a way as to save the vapors which had been escaping and to reclaim from the B. S. the oil contained therein; also to recover from the B. S. ponds, where the waste matter had been deposited, the maximum amount of oil capable of recovery therefrom, and it was finally determined to construct what is known as the 'dehydrater.'

"15. The dehydrater is a large plant, costing over four hundred thousand ($400,000.00) dollars, and is located about three miles east of the Hamilton and Shriver lands and on the main road to El Dorado. A system of pipe line was laid, connecting the tanks of all of the wells upon plaintiffs' lands and upon nearly all other leases owned by the defendant in the El Dorado district, at a further cost of about two hundred and fifty thousand ($250,000.00) dollars. The defendant operated at that time and at the time of the trial of this action about seventy-five (75) leases in that district, with about thirteen hundred and fifty (1,350) wells, all connected with the dehydrater. No other company owns nearly that number of leases in the district.

"16. The dehydrater was built by the defendant. It is operated by the

Hamilton v. Gas and Fuel Co.

Empire Petroleum Company, but the defendant pays the Empire Petroleum Company the entire expense of operating the plant. The defendant also pays the Empire Petroleum Company for any loss due to any overpayment which the Empire Petroleum Company may make on account of its giving credit for more oil delivered from the leases than the actual runs from the dehydrator delivered, if any such there be. The pipe lines receiving the oil from the leases are owned and operated by the Empire Pipe Line Company.

"16a. The Empire Gas and Fuel Company is the producing company. The Empire Pipe Line Company is the company that transports oil through its pipe lines. The Empire Petroleum Company is the buying company. The Empire Pipe Line Company lines connect with the dehydrater plant, and the oil from the dehydrater is turned into the connecting lines of the Empire Pipe Line Company. The treating of the oil at said dehydrater is done by the purchasing company. There is no treatment of the oil on the property of the plaintiffs.

"17. The method of conducting the dehydrater, briefly stated, is as follows:

"The oil, including water and other impurities, except such as have settled out by gravity, is collected through the pipe lines from the various leases and run into large receiving tanks and there commingled. From these tanks it passes through entirely closed, large pipes, which are heated by steam, and passes into entirely closed reservoirs, where it is further treated with chemicals, and this treatment removes practically all water and other impurities, and the oil in good marketable condition is delivered into stock tanks or run into pipe lines for final shipment. In this treatment substantially all gasoline vapor is saved.

"18. The dehydrater was completed about March, 1919, and all leases were connected as soon thereafter as practicable. The J. E. Hamilton lease, referred to herein, was connected with the dehydrater March 18, 1919; the Joshua Shriver lease was connected March 15, 1919; and the J. L. Shriver connected May 24, 1919; and since those respective dates all oil from these leases has been delivered to the dehydrater.

"19. Ever since the connection with the dehydrater, the same method of measuring the fluid at the tanks on the leases and the same method of estimating the number of barrels of fluid run from the tanks, with the same strapping tables and the same method of payment therefor by the Empire Petroleum Company, have continued as were used prior to the time that the dehydrater was connected.

"20. Some time between March and the middle of the year 1919 the use of steaming plants upon the lease was discontinued, for the purpose of preparing the oil for the market, and as a consequence the fluid run from the tank into the pipe line and to the dehydrater contained considerable water which had not been separated by gravity from the oil, and which amounted to from about six to about twelve per cent or more of the total fluid content delivered from the tank; and in order to determine the amount of credit that should be given to the lessors and to the lessee, respectively, by the purchasing company, a sample was taken of this fluid and that sample tested for the purpose of determining the proportion of water contained in the sample;

and when that proportion of water in the sample was thus determined, then the same proportion was deducted from the total volume of fluid delivered into the pipe line, and credit was given to the lessor and the lessee for their respective portions of the remainder, so that the lessor received full credit for his one-eighth of the total amount of fluid run from the tank into the pipe line, less the proportion of water found to be contained therein.

"21. The method of selecting the sample of the fluid in the tank for testing during all of the time from the date the steaming process was abandoned for making marketable oil, and until January 19, 1921, was as follows:

"The instrument above referred to and called the thief (which is a square can one foot deep and about two inches across, open at the top; also open at the bottom when being submerged, but with a sliding bottom, which is closed by a spring which can be released quickly when the thief is at the point at which it is desired to take the sample) was submerged into the fluid in the tank at the top of that fluid and filled and emptied into a can, then the thief was lowered half way down to the pipe-line connection in the tank and again filled and emptied into the same can, and was again lowered down to just above the pipe-line connection and again filled and emptied into the same can. These three samples were thoroughly mixed by agitation, passed through a quartering device, and two portions separately tested in the centrifuge machine—until about August, 1920—which was revolved rapidly by hand until the water carried by centrifugal force separated from the oil so far as this treatment would separate it, and the proportion only, represented by the water thus separated, was accepted as the proportion to be deducted from the amount of oil delivered from the tank, for which both lessor and lessee received credit and payment from the purchasing company.

"22. This method of testing the samples of oil by the use of the centrifuge machine was continued upon all leases until August 19, 1920, and payments were made during that time on the basis of that test, when it was determined and claimed by the defendant that the lessor in each case was receiving credit for more than his one-eighth of actual oil delivered, which was claimed to be due to the fact that the centrifugal machine did not separate all of the water from the oil, this being largely the water contained in the emulsion or B. S. which formed a part of the sample.

"23. Upon the 19th day of August, 1920, the defendant discontinued the use of the centrifugal machine for making the tests and adopted the method of distillation. By this method the samples taken from the tanks have been treated in the laboratory of the defendant—first about one mile, and later at Oil Hill, about six miles from the leases—by being measured, placed in a still, subjected to heating, and the vapors of gasoline and of water being collected in an accurately graduated tube, in which the water settles to the bottom, with the gasoline on top, and the amount of water thus extracted by distillation, and this only, is deducted from the total cubic contents of the sample which is treated; and this proportion of water to the total volume of the entire sample is the proportion that is used and deducted by the Empire Petroleum Company in estimating the amount of actual oil delivered from the tank, and upon this estimate its payments have been made.

"24. After further consideration and after the commencement of this suit, the defendant upon January 19, 1921, in taking the samples to be tested, used what is called a 'continuous-column method.' This is done as follows:

"A thief two feet long is attached to the pole used in gauging the depth of the fluid in the tank at a point so that the top of the thief is level with the top of the fluid. This sample is taken out and deposited in the receiving can; then the thief is placed two feet lower on the pole and is submerged and the sample taken and deposited in the same can; and so on until the thief has taken a continuous sample down to the pipe-line connection, and these samples, being thoroughly mixed and treated by distillation, have formed the basis of estimating the amount of oil for which credit is given since January 19, 1921.

"25. Each lessor receives payment for his royalty based upon the amount of fluid run from the tank upon his own land, after deducting the amount of water as so determined by the test of the samples, without regard to what happens to the oil after it passes from the tank into the pipe line, and without regard to what is done with it at the dehydrater.

"26. The present method of gauging and measuring the tanks and fluid in the tanks is correct and proper.

"27. The present continuous-column method of taking the samples to be tested and treated gives a fair sample of the whole volume of fluid in the tank.

"28. The present method of testing the samples by distillation to determine the per cent of water contained therein is correct, and if the work in the laboratory is accurately done—and this must be very accurate, since the sample is such a very small portion of the whole—and honestly reported, then the result is correct.

"28a. This method of determining the amount of marketable oil delivered into the pipe line is not used by any other company in this midcontinent oil field, but all others steam the oil on the leases, before turning same into the pipe line, when necessary.

"29. Comparisons have been made of the records of the dehydrater, which show the total amount of oil actually recovered during definite periods, and the other records of the Empire Petroleum Company, showing the total amount of oil during the same periods, for which all lessors in the field have received payment for their one-eighth royalty. These comparisons show that during the time from March, 1919, when the dehydrater was completed, to August 1, 1920, during which time the centrifuge machine was used, there was an overpayment to all lessors.

"30. The comparisons referred to in conclusion 29 also show that from August 1, 1920, to June 1, 1921 (shortly before the trial of this case), during which time the distillation test had been in operation, there was still a small overpayment to lessors, amounting to about 0.65 per cent.

"31. The total number of barrels of oil produced by the defendant in the field during the year 1918 was 12,066,191.65, while the total number of barrels produced by the defendant in the field during the year 1919 was 7,837,284.17, showing a decrease in the amount of production for the twelve months next prior to January 1, 1920, to be 35 per cent.

"32. The cost to the Empire Gas and Fuel Company of maintaining and operating the separate steaming plants upon all of the leases connected with the dehydrater will at all times substantially exceed the cost of operating the dehydrater itself.

"33. Under the steaming plant a very substantial portion of the oil was necessarily thrown away into the B. S. ponds. The abandonment of the steaming process and charging against the lessor only the water contained in the B. S. has saved to both parties substantially all of the oil contained in the B. S. About 30 per cent of this B. S. is oil.

"34. By the use of the dehydrater the B. S., which had formerly been thrown into the ponds, has been reclaimed and run to the dehydrater, and there practically all of the oil has been extracted from it, and in each case the lessor has received payment for his one-eighth.

"35. The maintenance of steaming plants upon the separate leases necessitated the use of a considerable quantity of oil per day, which expense was borne by both lessor and lessee, and the abandonment of the steaming plants has resulted in a saving to both lessor and lessee in this respect.

"36. The plaintiffs have been offered the privilege of observing all tests made in the laboratory and have at all times had the privilege of observing the gauging of the oil and the sampling of the same at the tanks upon the leases, but it is not practicable, if possible, for the lessors to visit the laboratory of the defendant at all times when the particular samples of fluid from their leases are being worked, and then only a chemist, or one reasonably familiar with this character of laboratory work, could check up the result, and the lessors have no control over the samples of fluid which are finally treated after they are taken from the tanks at the wells.

"37. The returns in money to the plaintiffs for oil from their leases fell off suddenly and very materially about August, 1920."

The court stated its conclusions of law as follows:

"First. For the purpose of eliminating water and basic sediment and ascertaining quantity of marketable oil, the plaintiffs are entitled to have the fluid from their wells treated upon the leases so that they may ascertain and know for themselves the amount of oil that is delivered into the pipe line; or, the defendant should inaugurate a plan in the use of its present system under and by which the plaintiffs may be afforded an opportunity to know that a correct sample of the fluid from their wells is treated, and properly treated, in ascertaining the amount of marketable oil run from their leases, and this without any greater expense to them than they would ordinarily incur for the services of a gauger to oversee and measure the quantity of marketable oil in their tanks prior to being turned into the pipe line, after being steamed or otherwise made marketable by the defendant upon the leases.

"Second. Unless the defendant afford the plaintiffs, without additional trouble and expense to them, reasonable means and opportunity of ascertaining and knowing that the proportion of the fluid turned into the pipe line from the tanks on their leases, and which is reported by defendant to be marketable oil, and for which they are paid, is correct, then it should be re-

Hamilton v. Gas and Fuel Co.        .

quired to treat the fluid upon the leases so that when turned into the pipe line it shall represent oil sold, one-eighth of which would represent the plaintiff's share of marketable oil.        .

"It is, therefore, ordered that as a condition precedent to the continued use of its present method of ascertaining the amount of marketable oil delivered to the pipe line from the tanks on the leases of the plaintiffs, the defendant shall pursue the following course:

"First. Furnish to the gauger of the plaintiffs, in a proper receptacle, an equal part of the sample taken from the tanks for treatment at the laboratory.

"Second. Treat its sample at a time reasonably convenient for the gauger of the plaintiffs to be present and observe the work, and of which time the gauger shall be given notice by the defendant when the samples are taken from the tanks.

"Third. Give to the gauger of the plaintiffs, at the time of treating the fluid in the laboratory, a record report of the result thereof.

"Fourth. Treat the sample delivered to the gauger of the plaintiffs, when requested to do so, and give to said gauger a record report of same for the purposes of comparison.

"Fifth. Number all samples and reports of treatment thereof, so as to insure correct comparisons.

"Sixth. Pay to plaintiffs the reasonable expense incurred by them in handling the samples and observing the work of the defendant in treating the same, over and above the ordinary and reasonable cost of hiring a competent gauger to measure the oil in the tanks upon the leases after their being made ready for the market and before being turned into the pipe line, and if plaintiffs and defendant are not able to agree, then this court to ascertain and fix the amount which shall be paid by defendant to the plaintiffs on this account.

"Seventh. File in these cases its consent and offer to comply with these suggestions, within forty days from this date.        `

"And it is further ordered and adjudged that when, and so long as, the defendant complies with these requirements, as hereinbefore suggested, then it shall be permitted to continue its present method of marketing the oil from the leases of the plaintiffs, and the relief prayed for by them be denied; but upon defendant's refusal to comply with these requirements, judgment should, and will, be rendered in favor of the plaintiffs in these actions."

Defendant moved for a modification of some of the findings of fact made, and for some additional findings. Reading the evidence, it would seem that this motion might have been sustained in part at least, but we do not regard the overruling of this motion as material. The defendant objected to the conclusions of law and to the judgment rendered and moved for judgment in its favor upon the findings made. This motion was overruled, as was also its motion for a new trial.

Defendant's motion for judgment in its favor on the finding of fact made by the trial court should have been sustained. Plaintiffs were

defeated by the evidence; and the court found against them upon their allegation that the "thief test," or method used by defendant in determining the amount of oil produced and saved from the lease, was inaccurate and resulted in loss to plaintiffs. So thorough was this evidence that counsel for plaintiffs, while a witness was being examined in the trial, spoke up and said, "Understand me, I think your distillation test is a splendid test. I am not attempting to attack your tests at all on that." And both in the oral argument and brief in this court it is frankly conceded that the method of testing the samples taken from the tanks by the instrument called a thief is scientific and accurate and correctly shows the percentage of water to be deducted from the total quantity of oil and water run from the tank. The allegation in the petition that the method of the defendant in testing the oil and in treating it so as to make it marketable resulted in loss and damage to plaintiffs also was thoroughly disproved. On the other hand, the evidence and findings show that the method used by defendant results in a substantial saving and benefit to plaintiffs, as well as to defendant; by saving the most volatile and valuable portions of the oil that were lost by the heating and steaming process; by saving the basic sediment, thirty per cent of which is oil, all of which was wasted under the heating and steaming process; and by not having to use ten barrels of oil per day to operate the heating and steaming plants. So the relief sought by plaintiffs in their petitions—that defendant be enjoined from continuing to use the "thief test" in determining the amount of oil produced and saved from the leased premises, and for a decree requiring defendant to reëstablish and operate the steam-heating plants upon the leases—is no longer seriously contended for. In fact, they say, in substance, that this large, expensive, efficient dehydrating plant used by defendant should not be junked, and the former wasteful and more expensive method of steam heating the oil in the tanks on the leases reëstablished in its stead.

But plaintiffs contend that because of the clause in the lease which obligates the lessee "to deliver to the credit of the first party, his heirs or assigns, free of cost, in the pipe line to which it may connect its wells, the equal one-eighth part of all oil produced and saved from the leased premises," and since defendant, with consent of plaintiffs, did establish and operate the steam-heating plants upon the leases so as to treat the oil and make it marketable when turned into the pipe line from the tank, the parties to the lease have put

an operative interpretation upon the lease which has become in effect a part of the lease, which plaintiffs are entitled to have enforced.

Let us examine this contention for a moment. When the leases were made, in 1914, there was no oil produced in the El Dorado field where these lands are situated, hence whether oil, if found there, would need treatment to make it marketable, or the method of treatment if that should be necessary, was not mentioned in the lease. The lease did provide that the lessor should have one-eighth of the oil produced and saved from the leased premises; that is all it did provide. The method of producing the oil and saving it was for the lessee to determine. It was contemplated, of course, that the lessee's methods of producing and saving the oil should be fair, and that no fraud should be practiced upon the lessor; but plaintiffs do not charge fraud, and the court has found and plaintiffs now admit that the method is fair. For some time after the wells were drilled, in 1917, the oil was sufficiently pure that it needed no treatment; the pipe lines took it as it came from the wells; hence during that period there was no mutual interpretation of the lease which required the treatment of the oil on the lease. Later, as the wells were pumped, water came into them and was pumped up with the oil—so much water that the purchasing company would not take the oil in that condition. The oil, of course, was worth nothing either to plaintiffs or to defendant unless it could be sold; so defendant began to treat the oil to free the water from it enough to make it marketable. There is no evidence that it consulted the plaintiffs about what method to use. It went ahead to prepare the oil for market and used the best and most practical method then known to its officers and employees, and the method then generally used in the El Dorado field. It discovered that this method was expensive and wasteful and it set about to find a better one.

Defendant had 75 leases in a compact territory, upon which it had 1,350 producing wells. Its officers concluded it could well afford to spend $650,000 to build a central dehydrating plant which would take all the water and foreign elements from the oil and make it marketable and connect all its wells with it. Plaintiffs' wells were connected in March and May, 1919, and the steam-heating plants on the leases were then discontinued. These suits were filed November 3, 1920, so at that time the use of the steam-heating plants had been discontinued for a longer period than they had been used on the leases. Under this state of facts their use cannot be said to have

been an operative interpretation of the lease by the parties that the oil must be treated by the steam-heating process upon the lease which the plaintiffs are entitled to have enforced, even if the clause in the lease were open to such an interpretation, which may well be doubted.

What plaintiffs are really asking now is, not that defendant be enjoined from using its present method of treating the oil to render it marketable and of testing the quantity to be paid for, and that it be required to reëstablish and operate the steam-heating plants on the leases as they prayed in their petitions, but they want the defendant to be compelled to perform the alternative judgment offered them by the trial court. It should be a sufficient answer to this contention to say that when a plaintiff brings a suit and makes allegations which if established by proof would entitle him to the relief sought, or some similar relief, and then in the trial his proof fails and he does not establish any of the material allegations upon which he relies, he is not ordinarily entitled to any judgment in his favor.

Since the method now used in marketing the oil from plaintiffs' leases is not to treat the oil so it is marketable when turned from the tanks on the leases into the pipe lines of the purchaser, but to turn oil and water from the tanks into the pipe line leading to the dehydrater, where it is mingled with other oil and all of it treated, it is important that fair samples be taken and that these be accurately tested, for the oil is sold by sample and the lessors are paid by what the sample shows. This method of taking and testing the sample is described in the findings and is found and conceded to be correct. By this method the lessors receive and are paid for one-eighth of all the oil produced and saved from the lease. This is all their lease provides that they shall receive.

The court found that the method used by defendant in determining the amount of marketable oil delivered into the pipe line is not used by any other lessee in the midcontinent oil field, but all others steam the oil on the leases, when necessary, before turning the same into the pipe lines. And there was evidence that, aside from the practice of defendant, it was the universal custom in the midcontinent oil field that the lessor receive his royalty upon all oil turned from the stock tanks on the leases into the pipe line, without regard to what percentage of water it contained. From this it is argued that plaintiffs have a right to be treated as all other lessors in the field

are treated. While it is true that custom in the oil field determines the rights of the parties in many particulars, here is a situation to which it cannot be applied. The defendant is the only company in the midcontinent oil field having sufficient production in a compact territory to justify it in expending the sum necessary to build a central dehydrating plant and connect its wells with it. The method is advantageous financially both to plaintiffs and to the defendant. It is a step forward in the method of treating the oil which conserves all of the production from the wells, a portion of which was under the old method wasted or lost. A court should not require the abandonment of a correct, efficient, beneficial method because it is advanced, and require the return to a method that is wasteful and extravagant because such method was customary.

Plaintiffs cited and relied upon *Scott v. Steinberger,* 113 Kan. 67, 213 Pac. 646. The question there was the price to be paid for gas, whether the lessor should be paid on the basis of the price of gas at the end of the pipe line through which it was marketed, or should he be paid upon the basis of the price of gas at the lease, and it was held—

"That the lessor was entitled to receive his share as measured into a pipe line which connected with the well, at the price or value of gas at that place, and not the price or value that was obtained for it at some distant place on the pipe line to which it was transported and sold." (Syl.)

There is nothing in this holding which conflicts with the conclusion here reached. The oil of plaintiffs is measured in the tanks on the leases and samples are taken, from which is determined the percentage of oil and water in the total quantity of fluid turned into the pipe line. So the oil is measured on the leases and plaintiffs are paid in accordance with that measure.

Plaintiffs argue that the method used places them at the mercy of defendant; that defendant's agents and employees turn the oil from the tank, take the measurements, take the sample, and at defendant's laboratory, by a process with which plaintiffs are not familiar, they determine the amount of oil to be paid for. It is pertinent to ask, Who would do this if defendant did not? The lease is of no value to either party unless it is operated. By the lease the defendant is required to operate it. The plaintiffs have no liability in that regard; plaintiffs are only indirectly concerned with method of operation; they are primarily concerned with the result obtained. So long as the method used by defendant is fair and

efficient and by its use the plaintiffs receive and are paid for one-eighth of all the oil produced and saved from the leased premises, they have nothing to complain about. (*Colgan v. Oil Co.*, 194 Pa. 234; *Locke v. Russell*, 75 W. Va. 602; *Grass v. Development Co.*, 75 W. Va. 719.)

The evidence shows that even prior to the use of this method by defendant, that plaintiffs employed a man to watch and check the work of the gauger of the purchasing company and report to them, in order that they might have information of their own as to the amount of oil produced from the leases. The evidence shows that some other royalty owners do the same thing. By the method used by defendant the court finds that the taking of the samples and analyzing them to determine the amount of oil to be paid for must be done with care in order to be accurate, and obviously that is true, but the evidence is, and the court finds, that this work was being done with care by defendant. Now, if the plaintiffs desire to know with certainty the amount of oil they should be paid for, there is no reason why they could not have an employee take samples at the same time samples are taken by defendant and have them analyzed by some one employed by them, and they should be permitted to do that if they desire to do so. But there is no complaint along this line. Plaintiffs have never been denied the right to have their employee present at the time samples were taken and the oil turned into the tanks; in fact, the evidence shows that he was present at such times when plaintiffs desired him to be. And he should be permitted to take samples at the same time and under the same circumstances as those taken by defendant, or if there is likely to be a difference between the two samples taken, to have a part of the sample taken by defendant and then to have that examined. But these rights have not been denied and they are not complained of by plaintiffs. But there is nothing in the lease that would require defendant to pay plaintiffs' employee for doing such work. Defendant is required to treat the plaintiffs fairly and to pay them for their full one-eighth of the oil produced and saved from the leased premises, and when it has done that its obligation is fulfilled.

We have examined all of the authorities cited by counsel on both sides. There is nothing in any of them contrary to the conclusions here reached. It will not be necessary to make a more extended reference to them, for in its final analysis this case gets down to this proposition: When a plaintiff is defeated at the trial upon all the

material allegations of his petition and it is clear he has sustained no injury, the defendant should not be put to great expense because plaintiff entertains a fear that possibly he might be injured in the future. When he sustains such injury—if he does—the courts will give him relief.

The judgment of the court below will be reversed with directions to sustain defendant's motion for judgment in its favor upon the findings.