William Colgan *v.* The Forest Oil Company, Appellant.

*Lease—Oil and gas lease — Covenant—Specific performance—Fraud—Equity—Equity jurisdiction.*

A court of equity will not assume jurisdiction to enforce specifically covenants in an oil and gas lease which are merely implied, and whose extent depends altogether on oral evidence of opinions, unless it appear that the lessee is fraudulently evading his obligations to the lessor.

There is no relation of special trust or confidence between lessor and lessee in gas or oil leases, any more than in any other. Like all other contracting parties they deal at arm's length, each for his own interest. So long as the question is one of business judgment and management, the lessee is not bound to work unprofitably to himself for the profit of the lessor, and the parties must be left as in other cases to their own ways. It is only when a manifestly fraudulent use of opportunities and control is shown that courts are authorized to interfere.

If a lessee of oil and gas lands derive some collateral or incidental advantages from his leases of adjoining territory he is entitled to them, just as a stranger would be. He may operate them jointly, at less expense, or he may be helped in other ways by having both under one management. It is only when wells on adjoining territory are being fraudulently used to drain the lessor's land that courts have any occasion to interfere. If, in such a case, the sinking of wells on the adjoining territory would render it necessary for the lessor to put down another well to save his own land from exhaustion, then it would be the duty of the lessee to put down the additional well that his lessor might get the proper royalty.

Where a lessee in an oil lease has bound himself by covenants to develop a tract, and has entered and produced oil, he has a vested estate in the land which cannot be taken away on any mere difference of judgment; and a court of equity, in the absence of any allegation of fraud, has no jurisdiction to compel the lessee to sink additional wells, nor to forfeit the lease and oust him from possession in order to allow the lessor to experiment.

Argued Nov. 4, 1899. Appeal, No. 183, Oct. T., 1899, by defendant, from decree of C. P. No. 2, Allegheny Co., April T., 1899, No. 353, on bill in equity. Before STERRETT, C. J., GREEN, McCOLLUM, MITCHELL, DEAN and FELL, JJ. Reversed.

Bill in equity for forfeiture of an oil and gas lease or, in the alternative, for the specific performance of covenants contained in the lease, by sinking additional wells.

FRAZER, J., found the facts to be as follows:

1. The plaintiff, being the owner of a farm situate in Penn township, December 3, 1890, leased the same to Thomas Liggett for oil and gas purposes. At the time of the execution of the lease the plaintiff received the sum of $65.00 in cash, and under its terms was to receive one eighth of all oil produced upon the premises, and an annual rental of $500 for each gas well so long as the same is utilized off the premises; the lease to remain in force for the term of three years from the date thereof, and thereafter, while oil or gas may be produced from the premises, the lessee to complete a well on the premises within one year from December 3, 1890, or in default thereof to pay the lessor $130 per annum, in quarterly instalments, until such well is completed.

2. Thomas Liggett, May 19, 1891, duly assigned and transferred the oil and gas lease on plaintiff's farm to John M. Patterson, who subsequently assigned the same to the Forest Oil Company, the defendant herein, which company still holds the lease.

3. Under said lease five wells have been drilled on the plaintiff's farm, wells known as Nos. 1 and 2, located near the northern line; each produced gas for a time, but are now and have been for some time abandoned; wells Nos. 3, 4 and 5 were drilled along the southern part of the farm, No. 4 being in the extreme southeastern corner, 135 feet from Caldwell's line; No. 5 about        feet west of No. 4 and 25 feet from Caldwell's line, and No. 3 about half way between Nos. 4 and 5, and 210 feet from Caldwell's line. These three wells have been producing oil since their completion, Nos. 3 and 4 always being small producers, while No. 5 started off at from twenty-five to twenty-eight barrels per day, but fell off to such an ex-

tent that it was producing but eight barrels per day at the end of six months. The three wells together are now producing about three and one half barrels per day.

4. The defendant's farm contains sixty acres of land, is bounded on the north by lands of John Singhose and S. Aronson; on the south by Washington Caldwell; on the east by Allegheny Valley Railroad, and on the west by lands of Uriah Ryan. The defendant holds oil and gas leases on the lands adjoining plaintiff on the north, south and west, and these adjoining lands have been drilled upon by defendant with the following results: On the Ryan farm, well No. 1 located 535 feet from the southwest corner of plaintiff's line, always a small producer of oil, now producing between two and three barrels daily; No. 2 located 200 feet west of plaintiff's line and near the northwest corner of his farm, this well came in dry and has never produced either oil or gas, and Nos. 3, 4 and 5 located respectively 975 feet, 750 feet, and 1,640 feet from plaintiff's southeast corner, all small producers at first and now abandoned; on the Caldwell farm, well No. 1 located 480 feet south of plaintiff's line, is now producing one barrel per day; No. 2 located 768 feet from plaintiff's south line and between well No. 1 and Ryan's line, is now producing three to five barrels per day; and No. 4 located seventy-seven feet from the south line of plaintiff's land is now producing fifteen or sixteen barrels per day. This well is 400 feet southwest of plaintiff's well No. 5. On the north of plaintiff's farm there are two oil producing wells, one on the Aronson farm, located 285 feet from plaintiff's line, and the other on the Morris farm, located 355 feet from plaintiff's line. The production of these wells was not disclosed by the testimony. There are also two abandoned gas wells on the northern portion of plaintiff's farm, both of which are nearer plaintiff's east than his west line, and there is also an abandoned gas well on the Aronson farm 115 feet north of plaintiff's line.

5. The defendant company has refused to drill any additional wells on plaintiff's land, alleging that the probabilities of getting a paying well would not justify the cost of its putting down, viz: about $4,500, and called witnesses who testified to that effect. It is also contended by the defendant that the wells already drilled upon plaintiff's farm are amply sufficient to bring to the surface the oil still remaining thereunder.

6. The nature of the rock from which the oil is produced determines the extent of the area which a well will drain. A well producing from coarse and loose sand will drain for a greater distance than one producing from a hard and compact rock.

7. The oil producing rock or sand underlying the Colgan and adjoining farms is of a loose nature, and wells producing from that sand will drain for a distance of about 500 feet.

8. Well No. 5 on the plaintiff's farm was completed and began producing oil in the month of November, 1895. At first its daily production was between twenty-five and twenty-eight barrels, which production continued, although slightly diminished, until February, 1896, when well No. 4 on the Caldwell farm was completed, and began producing oil at the rate of twenty-five barrels per day, whereupon the production of Colgan No. 5 decreased to eight barrels per day, and has since continued to fall off until its daily production is now less than one barrel per day, while the production of Caldwell No. 4 continued at fifteen barrels per day. Taking into consideration the nature and quality of the oil producing sand in that neighborhood, the distance between those two wells, their location and the fact that the production of Colgan No. 5 fell off immediately upon the completion of Caldwell No. 4, we find that Caldwell No. 4 is drawing oil from sand underlying plaintiff's farm from which oil was previously taken by Colgan No. 5.

9. About thirty acres of plaintiff's farm, being the western half thereof, has not been tested for oil and gas purposes, and plaintiff is anxious to have the same tested, and will either drill himself or lease to some person who will, if permitted to do so.

The conclusions of law were as follows:

Under the terms of the lease in this case the defendant has the sole and exclusive right to drill for oil and gas on the plaintiff's farm, and while there is no express clause in the lease requiring that more than one well be drilled, it is now the settled law of the state that the lessee shall drill without unnecessary delay upon the leased premises as many wells "as may be reasonably necessary to secure the oil for the common advantage of both lessor and lessee." This the defendant was bound to do in this case. Whatever number of wells was reasonably necessary to develop and test the plaintiff's farm, it was bound to

drill, and in determining the number and location of the wells, it was bound to take into consideration the wells drilled on the adjoining farms, their production and the nature and quality of the sand from which the oil is drawn; whatever care and prudence would dictate should be done, not only to prevent plaintiff's oil from being brought to the surface through wells upon his neighbor's land, but to produce it upon his own land without unreasonable delay, it was defendant's duty to do. In this case the farm contains sixty acres; thereon have been drilled five wells, all with the exception of No. 5 being on the east half, the west half being entirely untested. There are producing wells on property adjoining it on the north; there is a number of producing wells, or wells that have produced oil until recently, on its south and west; the wells to the north of plaintiff's farm and those on the south are about on a forty-five degree line, and the sand from which the oil is produced is fairly loose and porous. These conditions, we find, show with a reasonable degree of certainty that the western half of plaintiff's farm would furnish at least one paying well.

The court decreed that defendant shall, within twenty days after notice of decree in accordance with these findings, stipulate in writing, to be filed in this case, that it will put down a well on the western portion of plaintiff's farm, and begin the same within twenty days thereafter, and prosecute the same to completion with all reasonable diligence and in good faith; in default of such stipulation, or a compliance therewith, the defendant shall be deemed to have abandoned its said leasehold estate in said land, except as to wells known as Colgan Nos. 3, 4 and 5, and a space of 500 feet around said wells on all sides, together with the rights of way and other rights incident thereto under the terms of said lease necessary to the operation of said well; that the costs of these proceedings be paid by defendant.

*Error assigned* was the decree of the court.

J. McF. *Carpenter*, with him R. W. *Cummins*, for appellant. —Whatever of confusion may have arisen respecting the precise nature of the lessee's interest (and it must be admitted that some confusion has existed, as shown by the numerous reported cases) there is no longer any question that, although

the instrument may be a mere license until oil is found, at that moment an estate vests: Brown v. Beecher, 120 Pa. 590; Kitchen v. Smith, 101 Pa. 452; Venture Oil Co. v. Fretts, 152 Pa. 451.

It is asking rather too much of the man who has risked his money in an uncertain venture to surrender his vested rights or spend thousands of dollars in order that the curiosity and cupidity of his lessor may be gratified, and that it may be demonstrated that the expenditure was wholly useless.

*J. K. P. Duff*, for appellee.—To require appellant to surrender the territory which he refuses to develop is not "a deprivation of a legal right for which we have paid cash, and for which we receive nothing in return." Appellant obtained the whole farm of appellee, coupled with the duty on his part to develop the oil on the whole farm if there was a reasonable prospect of success. That duty he refuses to fulfil. The decree appealed from will work him no injustice if he complies with the alternative prescribed therein: Kleppner v. Lemon, 176 Pa. 502.

OPINION BY MR. JUSTICE MITCHELL, December 30, 1899:

This is a bill in equity by lessor against lessee for specific performance of covenants, or in the alternative for forfeiture of the lease and also for an account. As the covenants are merely implied, and their extent depends altogether on oral evidence of opinions, the case for relief is wholly wanting in that precision and certainty of contractual duty which is necessary to sustain the ordinary chancery decree for specific performance. The jurisdiction of equity in a similar case was, however, sustained in Kleppner v. Lemon, 176 Pa. 502, and we do not now propose to question it. But that decision was on the ground of fraud, the majority of the Court being of opinion that the defendant was fraudulently evading his obligations to plaintiff while draining the oil from plaintiff's land through wells on adjacent territory. "The findings show," says WILLIAMS, J., "that it is the expressed purpose of the defendant to secure Kleppner's oil through his wells on the Garlach and Stotler tracts of land." The basis necessary to sustain the bill, therefore, is fraud, and that of course must be affirmatively and clearly proved.

There is no relation of special trust or confidence between lessor and lessee, in gas or oil leases, any more than in any other. Like all other contracting parties they deal at arm's length, each for his own interest. So long as the question is one of business judgment and management, the lessee is not bound to work unprofitably to himself for the profit of the lessor, and the parties must be left, as in other cases, to their own ways. It is only when a manifestly fraudulent use of opportunities and control is shown that courts are authorized to interfere.

The defendant contracted by its lease to put down one well on the plaintiff's land; it has in fact put down five. The bill charges, however, that the five were put down on the eastern half of the farm, to the neglect of the development of the western half, and further, that, although five wells were sunk on the eastern side, yet defendant was unduly draining that part of the land by wells on adjoining territory leased from other owners. As to this latter complaint the bill asked that such outside wells " be decreed to be wells taking and draining the oil from plaintiff's said land," and that an account and payment be ordered. The plaintiff's case, however, was so absolutely wanting in merit on this branch that the learned judge below not only granted no relief, but did not even discuss it in his conclusions of law. It would not be necessary, therefore, for us to consider this part of the case at all, were it not that the evidence throws a very strong light on the main question of good faith in the defendant's whole plan of operations for the development of the farm.

As already said defendant's contract obligation was to sink one well. It has sunk five. One of these, known as Colgan No. 5, it was desirable in defendant's judgment to locate very near the line of another lessor, Caldwell. Defendant accordingly consulted both plaintiff and Caldwell, who both agreed to the location chosen, with the notice from defendant to plaintiff that if it proved a paying well, defendant would in justice to Caldwell put down another on Caldwell's side of the line as an offset. This was done. The well on plaintiff's side of the line proved a fair producer, though it declined after a few weeks, and the other well was then sunk on Caldwell's side and proved about an equal producer. This second well, known as Caldwell No. 4, is the chief subject of plaintiff's complaint and re-

Colgan COLGAN v. OIL CO. 241

quest for an account. It is quite apparent, as the learned judge reports, that each of these wells draws its supply partly from the other's territory, but this was foreseen, and an express agreement made as to the location of the first one and the necessity for the second "as an offset." The plaintiff's bill, therefore, on this branch is conclusively met by his own agreement beforehand to the conduct he now complains of. In cases of this kind, arising from conflicting claims as to the territory from which the supply of any particular well is drawn, the rights and duties of the parties must be determined by their contracts. As between the parties each lease must stand upon its own terms. The obligations, for example, of the defendant to the plaintiff depend on the lease from the latter to the former, and are not in any way increased or diminished by other leases from other parties. If the defendant derives some collateral or incidental advantages from its leases of adjoining territory, it is entitled to them just as a stranger would be. It may operate them jointly at less expense, or it may be helped in other ways by having both under one management. It is only when the wells on adjoining territory are being fraudulently used to drain the complainant's land that courts have any occasion to interfere. The practical test is to be found in the question, are the outside wells, as for example, the Caldwell, draining the Colgan wells to such an extent that if the former were operated by a third party, the defendant, as lessee of the latter, would find it good management to put down another well to save its own leased territory from exhaustion? If so, then good faith to its lessor would require it to put down the additional well that the lessor might get his proper royalty. But, if not, the latter has no cause of complaint. If plaintiff, as owner, would not find it profitable to put down a well to stop his neighbor's drainage of his land, the lessee cannot be held to any higher obligation. He is not bound to work at his own loss for his lessor's profit. In the present case, so far from establishing any fraud, the plaintiff has clearly shown the entire good faith of the defendant.

On the other branch of the case the court below found that the western half of the farm "would furnish at least one paying well" and decreed that a well should be put down by the appellant. There is unfortunately no evidence whatever to sup-

port this finding. Not a single witness says so, and three experienced operators examined by defendant testify positively as to their judgment that another well would not pay for its cost. All that the plaintiff showed was that there are several wells on farms adjoining the west half, which are producing oil. How much was not shown, nor whether any one of them had paid for its cost. On the other hand the defendant's witnesses testified that these wells were light producers, and while they, being down, can now be worked at a profit, yet they have not paid for their cost, and are a positive disproof of the wisdom of putting down another.

The extent of plaintiff's own testimony was that he thought he "could get plenty of other parties to take" the land, "but I will do it myself." This is very far short of what is required. So long as the lessee is acting in good faith, on business judgment, he is not bound to take any other party's, but may stand on his own. Every man who invests his money and labor in a business does it on the confidence he has in being able to conduct it in his own way. No court has any power to impose a different judgment on him, however erroneous it may deem his to be. Its right to interfere does not arise until it has been shown clearly that he is not acting in good faith on his business judgment, but fraudulently, with intent to obtain a dishonest advantage over the other party to the contract.

Nor is the lessee bound in case of difference of judgment to surrender his lease, even pro tanto, and allow the lessor to experiment. Lessees who have bound themselves by covenants to develop a tract, and have entered and produced oil, have a vested estate in the land which cannot be taken away on any mere difference of judgment. It is not within the jurisdiction of any court to oust the owner and forfeit the title to estates in that way, and the jurisdiction of equity to decree any specific act or declare forfeiture depends on fraud averred and fully proved. Experimental drilling of other wells on the western portion of this tract may work injury to defendant's wells already down, without any corresponding advantage to the plaintiff. The weight of the evidence is that such would be the probable result, but whether it would or not the defendant is not bound to submit to the experiment. It has an estate in the whole tract, has fully performed its agreement in relation

thereto, and not a single fact has been shown to authorize the court to interfere with its title or possession.

Decree reversed and bill directed to be dismissed with costs.

194        243|
f216        ²366|

