Robert J. SEACAT and John J. Seacat, Plaintiffs,

v.

MESA PETROLEUM CO., a corporation, and G–S Oil & Gas Co., Defendants.

Civ. A. No. 80–1970.

United States District Court, D. Kansas.

Feb. 22, 1983.

Donald W. Bostwick, Wichita, Kan., for plaintiffs.

Gerald Sawatzky, Foulston, Siefkin, Powers & Eberhardt, Wichita, Kan., for Mesa Petroleum.

Jack Glaves, Glaves, Weil & Evans, Wichita, Kan., for G–S Oil & Gas.

## MEMORANDUM AND ORDER

THEIS, District Judge.

This action is before the Court on motions for summary judgment by plaintiffs and by defendant Mesa Petroleum Co. (Mesa). The key issue is the legal duty of an oil and gas lessee to the lessor when the lessee's well on a neighboring leasehold is draining oil from beneath lessor's tract.

Plaintiffs contend, in essence, that defendant is strictly liable for the value of the oil which is drained, regardless of the economic feasibility of drilling an offset well on plaintiffs' land. Defendant Mesa contends that the implied covenant to protect against drainage is limited by the "prudent operator" rule, which states that the lessee must do that which an operator of ordinary prudence would do to develop and protect the interests of the parties.

The uncontroverted facts are as follows. Plaintiffs own certain properties in Clark County, Kansas, which are subject to an oil and gas lease dated July 9, 1974, from plaintiffs, as lessors, in favor of Interstate Oil Corporation, as lessee. Defendant Mesa has acquired and now owns 75% of the working interest in the lease and defendant G–S Oil & Gas Co. owns the remaining 25%.

Defendant Mesa also owns 100% of the working interest in certain oil and gas leases covering, in part, properties adjacent to plaintiffs' property. These adjacent properties are known as the "Moore lease" and the "Francis lease." Mesa's net revenue interest, after allowing for all royalty interests, in these leases, is 82%. Mesa's net revenue interest in the Seacat Lease is 56.25%.

Mesa discovered the Morrow formation in the Lexington Field in December, 1978, with the drilling of the Moore I–20 well on the Moore lease immediately east of the Seacat lease. During a testing period of one and one-half months, the Moore I–20 well produced at approximately 1000 barrels a day. Subsequently, Mesa drilled nine more producing wells for a total of ten producing wells in the Morrow formation in the reservoir. Four of the wells were on the Seacat lease, four were on the Moore lease, and two were on the Francis lease. At all times the defendant Mesa has been the operator of these wells.

On September 29, 1980, Mesa filed with the Kansas Corporation Commission an application seeking unitization of the Lexington Morrow Unit. Mesa filed an amended application on July 22, 1981. The unit area designated by Mesa included portions of the Seacat, Francis and Moore leases.

Plaintiffs have submitted evidence of defendant Mesa's statements to the Kansas Corporation Commission which, plaintiffs contend, show that Mesa admitted that the Morrow formation was a single "pool" and that Mesa designated the percentage participation in the unit for five tracts (two in the Seacat lease, two in the Moore lease, and one in the Francis lease). Defendants have submitted evidence that the statements to the Kansas Corporation Commission concerning unitization concerned secondary, not primary, recovery from this field and are thus irrelevant to the issue of damages. In the Court's view, this question of the percentage of oil in each tract is in dispute, but this question is not crucial to the Court's decision process on these motions. Unitization was approved by the

Kansas Corporation Commission and unit operation began as of November 1, 1981.

The actual volume of oil and gas which has been produced by each of the ten wells in the unit has been calculated and is not in dispute.

Plaintiffs' primary contention is that, prior to unitization, oil and gas were drained from their tract by Mesa's wells on adjoining tracts. Plaintiffs seek recovery of the value of the drained oil and gas under the implied covenant to protect against drainage.

It is clear that Kansas law governs this decision under the doctrine of *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). While the Kansas cases give somewhat conflicting signals as to the standards which should govern this case, this Court believes that, were the Kansas Supreme Court confronted with this case, it would apply a variant of the "prudent operator" test. Because genuine issues of fact remain as to whether defendant Mesa acted in a manner befitting a prudent operator, plaintiffs' motion for summary judgment must be overruled.

Plaintiffs admit that if defendant Mesa was not the operator of the adjoining leasehold, the "prudent operator" test would apply. Plaintiffs contend, however, that because defendant Mesa operates both leases, it is held to a higher standard and is, in effect strictly liable to prevent any drainage from plaintiffs' land, regardless of the economic feasibility of drilling an offset well.

Plaintiffs rely on *Culbertson v. Iola Portland Cement Co.*, 87 Kan. 529, 125 P. 81 (1912), and a series of cases from other jurisdictions holding that the lessee's duty is absolute and not governed by the "prudent operator" test when the lessee is operating the draining wells. *Cook v. El Paso Natural Gas Co.*, 560 F.2d 978 (10th Cir. 1977); *Olsen v. Sinclair Oil & Gas Co.*, 212 F.Supp. 332 (D.Wyo.1963); *Geary v. Adams Oil & Gas Co.*, 31 F.Supp. 830 (E.D.Ill.1940); *R.R. Bush Oil Co. v. Beverly-Lincoln Land Co.*, 69 Cal.App.2d 246, 158 P.2d 754 (1945); *Millette v. Phillips Petroleum Co.*, 209 Miss. 687, 48 So.2d 344 (1950); *Shell Oil Co. v. James*, 257 So.2d 488 (Miss.1971); *Kleppner v. Lemon*, 197 Pa. 430, 47 A. 353 (1900).

In *Culbertson*, defendant was the operator on both plaintiff's and adjacent land. The plaintiff claimed damages for drainage from the adjacent land. The court ruled that defendant failed to develop the land in such a way as to give plaintiff his proportional share of the gas produced from the pool and that plaintiff was entitled to receive his share of the gas actually taken. The court made no mention of the "prudent operator" test.

In light of subsequent rulings of the Kansas Supreme Court, the current vitality of *Culbertson* is, at least, open to question. In two cases in which the defendants operated both the lease in question and the adjoining lease, the "prudent operator" rule was followed.

In *Myers v. Shell Petroleum Corporation*, 153 Kan. 287, 110 P.2d 810 (1941), defendant-lessee operated wells east, west and northwest of plaintiff-lessor's tract. The record showed that, ordinarily, two offset wells would be required on plaintiff's land. The court ruled, however, that "no implied duty rests upon a lessee to offset a nonpaying well, when the offset probably would result in a loss to the lessee." *Myers*, 153 Kan. at 294, 110 P.2d 810. The Court states that:

> "A lessee or assignee of an oil and gas lease, under the implied covenant to diligently develop the property, is required to do what is reasonably expected of operators of ordinary prudence under the same or similar circumstances.... That, of course, means what a reasonably prudent operator would have done under the circumstances existing at the particular period of the alleged breach and not what hindsight indicates he possibly might have done.

> The large expense incident to exploration and development, combined with the fact the lessee, and not the lessor, must bear the loss of unsuccessful exploration and development, justifies the lessee in pro-

ceeding with reasonable caution and with a proper regard to his own interests, as well as those of the lessor. A lessee is under no implied duty to engage in an undertaking which is unprofitable to him, although it might, or would, result in some profit to the lessor." *Myers,* 153 Kan. at 295, 110 P.2d 810.

In *Rush v. King Oil Company,* 220 Kan. 616, 556 P.2d 431 (1976), plaintiff sought cancellation of the lease for failure to fulfill the implied covenants of development and protection against drainage. Defendant lessors owned and operated producing wells to the north, east and south of plaintiff's tract. The Court held that the prudent operator test was the proper rule of law in the case, and stated, at 618–619, 556 P.2d 431:

"Under the implied covenant of reasonable development when oil in paying quantities becomes apparent and the number of wells to be drilled on the lease is not specified, there is an implied obligation on the lessee to continue development of the leased premises by drilling as many wells as reasonably necessary to secure the oil for the common good of both the lessor and the lessee.... Under the implied covenant to protect against drainage, because of the fluidity of oil and the likelihood of its being withdrawn from the leased premises by the operation of wells on adjoining lands, a more rigid duty is imposed upon the lessee to protect the premises from substantial drainage. The lessee is obligated to drill sufficient wells at proper locations adjacent to the lease boundary at such points opposite producing well locations on adjoining lands to protect the premises from substantial drainage.

.     .     .     .     .

Whether a lessee has performed the duties imposed by these implied covenants is a question of fact. The extent of the duties required of a lessee is measured by what is referred to as 'the prudent operator test.' Under the prudent operator test the lessee must continue reasonable development of the leased premises to secure the oil for the common advantage of both lessor and lessee and may be expected and required to do that which an operator of ordinary prudence would do to develop and protect the interests of the parties.... The large expense incident to exploration and development, combined with the additional fact the lessee must bear the loss of unsuccessful exploration and development, justifies the lessee in exercising caution with regard to his own economic interests, as well as the interests of the lessor. A lessee is under no duty to undertake development which is unprofitable to him just because it might result in some profit to the lessor."

The Court upheld a verdict for plaintiff, as the evidence supported the need for further development under the prudent operator rule. Testimony "established the necessity for drilling additional tests to properly develop the remaining acreage and to protect against drainage." *Rush v. King Oil Co.,* 220 Kan. at 629, 556 P.2d 431.

Plaintiffs correctly point out that: (1) *Myers* did not discuss the implied covenant to protect against drainage, but only the implied covenant to reasonably develop; and (2) *Rush* did not expressly confront the question of whether operation by the lessee of the adjacent wells alters the prudent operator test. Plaintiffs also point out that in *Renner v. Monsanto Chemical Co.,* 187 Kan. 158, 354 P.2d 326 (1960), the court noted the "rigid" duty to protect against drainage and, in *Rush,* characterized this duty as "more rigid" than the duty to reasonably develop.

Thus, the Kansas rulings fail to squarely decide this case. On the one hand, there is an aged case holding defendant-lessee strictly liable, and more recent cases discussing the "rigid" duty to protect against drainage. On the other hand, *Rush* applies the prudent operator test to the covenant to protect against drainage even where defendant-lessee operated the neighboring wells. This issue does not appear to have been considered by the Court, however. In order to predict the ruling of the Kansas

Supreme Court, were it to confront this case, the Court has examined case law from other jurisdictions and the views of leading commentators.

As noted previously, a number of jurisdictions have followed an absolute duty test. A close examination of the basis for these rulings, however, demonstrates their weakness and the lack of support they lend plaintiffs' position.

The leading case and the only case cited in support of *Culbertson* is *Kleppner v. Lemon,* 176 Pa. 502, 35 A. 109 (1896); 197 Pa. 430, 47 A. 353 (1900); 198 Pa. 581, 48 A. 483 (1901). In *Kleppner,* the court held that where defendant operated the wells that caused drainage and intended to save the cost of a well on plaintiff's land by capture, defendant was liable. Rather than supporting the notion of absolute liability, the *Kleppner* decision centers on the notion of "fraud." This was made clear in *Colgan v. Forest Oil Co.,* 194 Pa. 234, 45 A. 119 (1899), which noted that *Kleppner* was based on fraud, with the Court being of the opinion that the defendant in *Kleppner* was fraudulently evading his obligations to plaintiff. The court in *Colgan,* went on to state, at 241, 45 A. 119:

> "It is only when the wells on adjoining territory are being fraudulently used to drain the complainant's land that courts have any occasion to interfere. The practical test is to be found in the question, are the outside wells, as for example, the Caldwell, draining the Colgan wells to such an extent that if the former were operated by a third party, the defendant, as lessee of the latter, would find it good management to put down another well to save his own leased territory from exhaustion? If so, then good faith to its lessor would require it to put down the additional well that the lessor might get his proper royalty. But, if not, the latter has no cause of complaint. If plaintiff, as owner, would not find it profitable to put down a well to stop his neighbor's drainage of his land, the lessee cannot be held to any higher obligation. He is not bound to work at his own loss for his lessor's profit."

In essence, *Kleppner,* as clarified by *Colgan,* espouses a rule essentially the same as the prudent operator test.

In *R.R. Bush Oil Co. v. Beverly-Lincoln Land Co.,* 69 Cal.App.2d 246, 158 P.2d 754 (1945), and the other cases cited by plaintiff, rest on the faulty premise that the lessee is getting something he has no right to when the adjoining wells capture lessor's oil or gas. As pointed out by two leading commentators:

> "In short, it looks as if lessee is getting something for nothing. This is a naive view of the matter. The lessee is in exactly the same position as the adjoining landowner to whose land the oil and gas is migrating. Under the Rule of Capture, what was once the plaintiff's mineral is no longer his. No one suggests that the drainage is fraudulent or wrongful so far as the adjoining landowner is concerned. The lessee, we submit, should be treated the same way.

> . . . . .

> The practicalities of the oil industry also indicate that no greater duty should be imposed on a lessee for operating adjoining wells. The economics of exploration in this country make advisable, and often imperative, the blocking up of large tracts before a test well is drilled. A rule that holds the lessee strictly liable for drainage to an adjoining tract under lease to him would inhibit this practice."

5 Williams & Meyers, *Oil and Gas Law,* § 824.2.

This position is supported by *Breaux v. Pan American Petroleum Corp.,* 163 So.2d 406 (La.App.1964), where the court rejected a "strict liability" rule urged by plaintiff, and stated, at 417:

> "If plaintiffs' lessee (who also controls production from the adjacent draining well) should establish that it would be economically unfeasible for him to drill an offset well on plaintiffs' land, he nevertheless, under plaintiffs' interpretation of the law, would be compelled (1) to drill the offset well in spite of the cost, or

(2) to surrender the lease, or (3) to discontinue producing from the adjacent well, or (4) to pay plaintiffs the value of a portion of the oil received from the adjacent well. We do not think the law would require the lessee under those circumstances to drill an offset well on plaintiffs' property when he could not hope to derive a profit from it, and in view of the established right of the adjoining landowner to capture and become the owner of the fugitive minerals which he may find under his land, we do not think plaintiffs have the right to compel the lessees to discontinue producing minerals from the neighboring tract or to pay to plaintiffs a portion of the oil produced from that tract."

The Court believes that the analysis in *Breaux* and by Williams & Meyers, is superior to that in the cases cited by plaintiffs and would be found convincing by the Kansas Supreme Court.

The Court notes that in *Cook v. El Paso Natural Gas Co.,* 560 F.2d 978 (10th Cir. 1977), a case arising in New Mexico, the Tenth Circuit upheld the rule urged by plaintiffs, but apparently did so primarily because the trial court's determination of New Mexico law was "not to be lightly disregarded."

In view of the strong endorsement of the prudent operator test by the Kansas courts and the weaknesses of plaintiffs' cases, the Court is convinced that the Kansas Supreme Court would adhere to the prudent operator test and reject the plaintiffs' legal theory. Because the Kansas courts have stated, however, that the duty to protect against drainage is "more rigid," and because the fact that the lessee operates the draining wells raises some problems, the Court believes that some alteration of the "prudent operator" test would be made by the Kansas Supreme Court.

Williams & Meyers explains the problems caused by defendant lessee operating the draining wells:

"Whenever the lessee is capturing plaintiff's oil from adjoining wells, there is a chance that the failure to protect is a result of unfair dealing by the operator. This possibility is graphically illustrated in the situation of the lessee's owning the full 8/8 interest in the adjoining land. Suspicion quickly arises that lessee prefers to take the mineral from wells on which he pays no royalty. Precisely the same temptation to disregard plaintiff's interest is present when plaintiff's land is burdened with overriding royalties and other interests in production greater than those on the adjoining land. Again, lessee can produce the same oil more cheaply from the adjoining land. Lastly, even where both tracts are subject only to the landowner's one-eighth royalty, there is less incentive to drill two wells when lessee owns both leases than when he owns only one. Lessee gets plaintiff's oil without the cost of a well on plaintiff's land. Undoubtedly, it is these opportunities for unfair dealings that lead courts to relax the plaintiff's burden when the lessee's operations cause the damage. Yet it should be remembered that the lessee has not necessarily yielded to temptation when he fails to drill an offset. And even if he has, it does not follow that holding him liable for failure to drill a noncommercial well is the remedy that rights the wrong."

5 Williams & Meyers, *Oil and Gas Law,* § 824.2.

These leading commentators then propose the following solution:

"In our view, the fact that it is the lessee's operations that cause drainage on lessor's land is an insufficient basis for eliminating the substantive requirement that an offset well be profitable. The most the law should seek to do is to require of the lessee the operations a reasonable prudent operator would undertake if he did not own the adjoining lease.

But because of the possibility of unfair dealings, the procedural law may properly be changed, although the substantive law should not be. The change we suggest would place the burden of going forward with evidence and the burden of

persuasion of profitability on the lessee. Thus, the plaintiff's case would consist of these elements:

(1) proof of substantial damages;

(2) proof that lessee's operations were the cause of the drainage;

(3) amount of the damages.

This evidence would be sufficient to withstand a motion to dismiss, and if defendant offered no evidence, plaintiff would get a directed verdict. Defendant can avoid liability, however, by proving that a protection well would not be profitable. Under this proposal, the only change in the law regarding the implied protection covenant is in the burden of proof on production in paying quantities. On this issue the lessee is ordinarily better informed anyway."

5 Williams & Meyers, *Oil and Gas Law,* § 824.2.

The Court notes that cases from two other jurisdictions indicate similar burdens of proof are required. In *Breaux* the court indicated the result "if plaintiffs' lessee . . . should establish that it would be economically unfeasible for him to drill an offset well." *Breaux v. Pan American Petroleum Corp.,* supra. This indicates that Louisiana would require the lessee to show unprofitability.

In *Dixon v. Anadarko Production Co.,* 505 P.2d 1394 (Okl.1973), the court noted that defendant lessee who is operating neighboring draining wells has superior knowledge as to the dangers of drainage and the profitability of an offset well. Thus, where lessee is draining lessor's land, lessee was held to have the burden to excuse the delay in drilling offset wells.

■ In the Court's view, the solution posed by Williams & Meyers and the above cases, fits well into the current Kansas case law, wherein the prudent operator rule remains in force, but the Kansas Supreme Court states that the duty to prevent drainage is "more rigid" than the duty to develop. For this reason, the Court holds that, while the ultimate test of defendant lessee's conduct is the "prudent operator" test, defendant will have the burden of showing that it acted as a prudent operator would have acted.

■ As it is clearly a disputed question of material fact as to whether defendant met the standards of a prudent operator, plaintiffs' motion for summary judgment must be overruled.

■ Plaintiffs have also moved for partial summary judgment on the issue of the fact and amount of drainage. Plaintiffs base this motion on statements by defendants before the Kansas Corporation Commission in the application for unitization. The Court believes the issue of the amount of drainage is one of factual dispute. Defendants contend that the unitization proceedings concerned secondary, not primary, recovery, and the statements made are not "admissions on file," within the meaning of the Federal Rules of Civil Procedure. It appears to the Court that the issues in the present case and those in the unitization proceedings may be far from identical and that the whole issue of the fact and amount of drainage during primary recovery is one of factual dispute. For this reason, plaintiffs are not entitled to partial summary judgment.

Defendant's motion for summary judgment rests upon four documents entitled "Release" signed by plaintiffs and submitted to the Court by defendant with its motion for summary judgment filed June 10, 1982.

Plaintiffs point out that Rule 8(c) of the Federal Rules of Civil Procedure, provides in pertinent part:

"In pleading to a preceding pleading, a party shall set forth affirmatively . . . release . . . and any other matter constituting an avoidance or affirmative defense."

Plaintiffs also point out that the first mention of these claimed releases in the filings in this case was in defendant's summary judgment motion. With this obstacle, defendant has moved the Court for permission to amend its answer so as to assert a defense based on releases.

Before considering defendant's motion for summary judgment, the Court shall first consider the motion for permission to amend. Rule 15(a) of the Federal Rules of Civil Procedure provides in pertinent part:

"A party may amend his pleading once as a matter of course at any time before a responsive pleading is served or, if the pleading is one to which no responsive pleading is permitted and the action has not been placed upon the trial calendar, he may so amend it at any time within twenty days after it is served. Otherwise a party may amend his pleading only by leave of court or by written consent of the adverse party; and leave shall be freely given when justice so requires."

The Supreme Court set forth the following standards to be considered when applying Rule 15(a) to a request for leave to amend.

"In the absence of any apparent or declared reason—such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of the amendment, etc.—the leave sought should, as the rules require, be 'freely given.'"

*Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 230, 9 L.Ed.2d 222 (1962).

As noted by Wright & Miller:

"Perhaps the most important factor listed by the Court and the most frequent reason for denying leave to amend is that the opposing party will be prejudiced if the movant is permitted to alter his pleading. Conversely, if the court is persuaded that no prejudice will accrue, the amendment should be allowed."

6 Wright & Miller, *Federal Practice and Procedure,* § 1487.

In this case, the Court sees no prejudice to plaintiffs if the amendment is allowed. Plaintiffs were aware of the releases and they had been the subject of discovery. The defendant's motion for leave to amend is granted.

The impact of these "Releases" is not sufficient to support Mesa's motion for summary judgment. Defendant contends the releases bar any claims by plaintiffs for damages due to any violation of the implied covenant to protect against drainage. The Court cannot agree, as the meaning of the releases on this point is a genuine issue of material fact.

The releases state that defendant Mesa is released "from all claims of and damages accruing, or to accrue, by and thru virtue of the drilling and operating of the (name of well) located in (location of well)." In effect, it appears to the Court that defendants would like to add to the above language the phrase: "and defendant is also released from all damages for failure to drill wells in violation of the implied covenants." It is not the function of courts to make contracts but to enforce them as made. *Springer v. Litsey,* 185 Kan. 531, 345 P.2d 669 (1959).

Of course, when a contract is ambiguous, the Court will hear evidence as to facts and circumstances existing prior to and contemporaneous with the execution of the contract so as to clarify the intent and purpose of the contract. *Weiner v. Wilshire Oil Co.,* 192 Kan. 490, 389 P.2d 803 (1964). A written instrument is ambiguous when the application of the pertinent rules of interpretation to the face of the instrument leaves it genuinely uncertain which one of two or more meanings is the proper one. *Gardner v. Spurlock,* 184 Kan. 765, 339 P.2d 65 (1959).

Rules of interpretation include the following. Reasonable rather than unreasonable interpretations are favored by the law. Results which vitiate the contract are to be avoided. The contract as a whole is examined taking into account all the language in the instrument and construing it in harmony with other portions of the agreement. *Weiner v. Wilshire Oil Co.,* supra.

It is to be remembered that "words will not be read into an agreement which import an intent wholly unexpressed when the agreement was executed." *Cline v. Angle,* 216 Kan. 328, 532 P.2d 1093 (1975).

After applying these rules of interpretation, the Court finds that the releases are

ambiguous and that evidence as to the facts and circumstances surrounding the execution of the releases is required in order to determine the true meaning of the releases. The brief language of the releases is strained mightily when it is expanded to include a release from all implied covenants, including that of protection from drainage. In fact, from the document, the interpretation that the release does *not* include a release from the covenant to protect against drainage is much more logical than Mesa's strained interpretation. On the whole, however, the Court finds that the releases are ambiguous and that a genuine issue of material fact remains as to their meaning. For this reason, defendant Mesa's motion for summary judgment must be overruled.

IT IS THEREFORE ORDERED that plaintiffs' motion for summary judgment is hereby overruled.

IT IS FURTHER ORDERED that defendant Mesa's motion for leave to amend its answer is hereby granted.

IT IS FURTHER ORDERED that defendant Mesa's motion for summary judgment is overruled.