**The MONARCH CEMENT COMPANY, a Kansas corporation, Plaintiff/Counter–Defendant/Appellee,**

**v.**

**LONE STAR INDUSTRIES, INC., a Delaware corporation, Defendant/Counter–Claimant/Appellant.**

**No. 92–3022.**

United States Court of Appeals, Tenth Circuit.

Dec. 22, 1992.

Michael Lerner (Mark A. Stites, with him on the briefs), of Stinson, Mag & Fizzell, Overland Park, KS, for plaintiff/counter-defendant/appellee.

A.J. Harper, II (Douglas C. McKenna of Watson, ESS, Marshall & Enggas, Olathe, KS, with him on the briefs), of Fulbright & Jaworski, Houston, TX, for defendant/counter-claimant/appellant.

Before MOORE and SETH, Circuit Judges, and CAMPOS, District Judge.*

JOHN P. MOORE, Circuit Judge.

Defendant Lone Star Industries, Inc. appeals the district court's summary judgment ruling in favor of plaintiff, The Monarch Cement Company. The case presents us with the question of whether an agreement entered into between Monarch and a predecessor of Lone Star was a contract determining employer liability under a re-

---

* The Honorable Santiago E. Campos, District Judge for the United States District Court for the District of New Mexico, sitting by designation.

tirement plan to be construed under state law, or an agreement which relates to a retirement plan in which state law is superseded by the Employee Retirement Income Security Act, 29 U.S.C. § 1001 et seq. We conclude the agreement is not related to a retirement plan and the district court correctly decided the issues. We affirm its judgment.

## I.

In 1979, Marquette Company, then a subsidiary of Gulf & Western Industries, Inc., sold its Des Moines, Iowa cement plant to Monarch. Monarch and Marquette entered into a Sale Agreement whereby Marquette employees were terminated on May 31, 1979 (Sale Closing Date) and employed by Monarch the next day.

After the sale, Monarch established a new pension plan (Monarch Plan) which mirrored the one previously used by Marquette (Marquette Plan).[1] Lone Star acquired Marquette in 1982 and became its successor-in-interest and administrator/fiduciary of the Marquette Plan. In 1987, Monarch closed the cement plant, triggering employee eligibility for so-called "Rule of 65" (shutdown)[2] and other "subsidized" pension benefits.

Before the plant shut down, a dispute arose between Monarch and Lone Star concerning the apportionment of liability for shutdown benefits. The dispute centered around whether Section 5 of the Sale Agreement created a pension sharing arrangement between Monarch and Marquette which Lone Star, as Marquette's successor-in-interest, was obligated to honor.

After the plant shut down, Monarch began paying its proportionate share of shut-

down benefits, but Lone Star refused to do so. Monarch was subsequently sued by its employees' union, which sought payment of shutdown benefits for employees who became eligible through their combined years of service with Marquette and Monarch, but were not receiving their full entitlement. That action was settled in 1988, when Monarch agreed to be bound by the court's decision regarding pension liability for an employee's years of service with Marquette.

Monarch then initiated this action against Lone Star, seeking a declaratory judgment that Lone Star (as Marquette's successor-in-interest) was liable for a share of shutdown and other benefits proportionate to an employee's years of service with Marquette. Lone Star counterclaimed for recovery of certain pension benefit payments it made after the Sale Closing Date, claiming the payments were erroneous. The district court granted Monarch's summary judgment motion, thus adopting Monarch's interpretation of the Sale Agreement under Kansas law, holding Lone Star liable for a share of pension benefits, and rendering Lone Star's counterclaim moot. The district court also considered and rejected Lone Star's contention that ERISA preempted Monarch's claim.

## II.

The underlying question in this case is which party is responsible for the share of shutdown benefits attributable to an employee's years of service with Marquette. The answer depends on how Section 5[3] of the Sale Agreement is characterized. If Section 5 sufficiently relates to the Marquette and Monarch Plans, then Monarch's claim is preempted by ERISA. To the con-

---

1. The parties have stipulated that the "benefit formulas, vesting requirements, and eligibility requirements for the various types of pensions provided are the same under both plans."

2. Under both pension plans, an employee became eligible for permanent shutdown or layoff retirement benefits (Rule of 65 benefits) if the employee had a minimum of 10 years credited service and the employee's combined age and years of credited service equalled 65 or more. Rule of 65 benefits were payable immediately.

3. Section 5, entitled "Pension Plans," clarified the respective liabilities of Monarch (as Buyer) and Marquette (as Seller). Lone Star succeeded to Marquette's rights and liabilities under the Sale Agreement, and thus Section 5, when it bought Marquette. Section 5 is the sole provision of the Sale Agreement disputed by Monarch and Lone Star.

trary, if Section 5 is merely part of a separate state-law contract, then Monarch's claim prevails and state contract law governs interpretation of Section 5.

Lone Star contends Monarch's common law breach of contract claim is preempted by ERISA because Section 5 of the Sale Agreement relates to benefit entitlements under the Marquette Plan, which indisputably is an ERISA plan. Emphasizing the broad scope of ERISA preemption, Lone Star argues that the Sale Agreement "clearly incorporates and references the Marquette Pension Plan and its terms." Lone Star further maintains Monarch's claim directly implicates the terms of the Marquette Plan, determination of entitlement to benefits, calculation and funding of benefits, and monthly payment of benefits. Therefore, Lone Star urges, Monarch's claim impacts the very administration of the Marquette Plan because reference to the Marquette Plan is critical to understanding and effectuating Section 5. Thus, Lone Star concludes, the district court's ruling against ERISA preemption "creates the very evils which ERISA was designed to preclude."

Lone Star argues, moreover, that ERISA would apply even if the Sale Agreement could be construed as a "simple divider" of pension liability between Monarch and Marquette because ERISA preempts state law causes of action. Lone Star bases this argument upon the assumption that the phrase "benefits accrued to the Closing Date" found in Section 5 refers to benefits under the Marquette Plan. Therefore, Lone Star reasons, Monarch's claim seeking interpretation of Section 5 relates to an employee benefit plan. Regardless of which interpretation the court might adopt, Lone Star argues, the court cannot avoid referring to the Marquette Plan.

Monarch agrees with Lone Star that state common law claims generally are preempted by ERISA. However, Monarch argues that ERISA preemption is "neither all-encompassing nor unlimited." Unlike other state law actions which have been found preempted by ERISA, Monarch's action calls for nothing more than interpreting the Sale Agreement and apportioning pension liabilities between it and Lone Star. Monarch argues the Monarch and Marquette Plans do not "speak[ ] to this apportionment; *only* the asset sale agreement, itself, deals with it." Thus, Monarch's claim does not "relate to" a pension plan as that term is employed for ERISA preemption.

Monarch also maintains that application of Kansas contract law to this case would not threaten the protections afforded by ERISA. Because the terms of the Monarch and Marquette Plans are identical, "[t]here is no dispute between Monarch and Lone Star over the amounts of benefits to which the individual employees are entitled ... or over when payment of those benefits commences." Rather, "[t]he respective parties' pension plans are involved in only one respect, namely, the nature and dollar amounts of the liability which was divided up are established by those plans."

 The standard of review for summary judgment rulings is *de novo, Housing Auth. of Fort Collins v. United States,* 980 F.2d 624, 627 (10th Cir.1992), and we employ the same standard applied by the district court. *International Bhd. of Elec. Workers v. Public Serv. Co.,* 980 F.2d 616, 618 (10th Cir.1992). The district court's summary judgment ruling will be affirmed if "there is no genuine dispute over a material fact and the moving party is entitled to judgment as a matter of law." *Russillo v. Scarborough,* 935 F.2d 1167, 1170 (10th Cir.1991).

As a preliminary matter, we must determine whether Monarch's state law claims are preempted by ERISA. ERISA § 514(a), 29 U.S.C. § 1144(a), states:

> Except as provided in subsection (b) of this section, the provisions of this subchapter and subchapter III of this chapter shall supercede any and all State laws [4] insofar as they may now or here-

---

**4.** "State laws" include "all laws, decisions, rules, regulations, or other State action having the effect of law." 29 U.S.C. § 1144(c)(1).

after *relate to any employee benefit plan* described in section 1003(a) of this title and not exempt under section 1003(b) of this title.

(emphasis added).

■ The key to ERISA preemption "is found in the words 'relate to.'" *Ingersoll-Rand Co. v. McClendon*, 498 U.S. 133, 139, 111 S.Ct. 478, 483, 112 L.Ed.2d 474 (1990). "A law 'relates to' an employee benefit plan, in the normal sense of the phrase, if it has a connection with or reference to such a plan." *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 96–97, 103 S.Ct. 2890, 2900, 77 L.Ed.2d 490 (1983). Thus, a state law may "relate to" an ERISA benefit plan and be preempted even if the law is not specifically designed to affect such a plan or the effect is only indirect. *Ingersoll-Rand*, 498 U.S. at 139, 111 S.Ct. at 483 (citation omitted).

This court has given broad meaning to the phrase "relate to," concluding common law tort and breach of contract claims brought by *employees* are preempted by ERISA "if the factual basis of the cause of action involves an employee benefit plan." *Settles v. Golden Rule Ins. Co.*, 927 F.2d 505, 509 (10th Cir.1991) (holding state law wrongful death suit preempted by ERISA). *See also Kelley v. Sears, Roebuck & Co.*, 882 F.2d 453 (10th Cir.1989) (state statutory and common law bad-faith negotiation of claims action brought by employee preempted by ERISA); *Straub v. Western Union Tel. Co.*, 851 F.2d 1262, 1264 (10th Cir.1988) (quoting *Anderson v. John Morrell & Co.*, 830 F.2d 872, 875 (8th Cir.1987)) ("[P]rinciples of common law governing a claimed contract right to have the plan modified clearly 'relates to' [sic] the plan and that state law in that area is preempted.").

The scope of ERISA preemption, however, is not unlimited. "What triggers ERISA preemption is not just any indirect effect on administrative procedures but rather an effect on the primary administrative functions of benefit plans, such as determining an employee's eligibility for a benefit and the amount of that benefit." *Aetna Life Ins. Co. v. Borges*, 869 F.2d 142, 146–47 (2d Cir.), *cert. denied*, 493 U.S. 811, 110 S.Ct. 57, 107 L.Ed.2d 25 (1989). Moreover, "[s]ome state actions may affect employee benefit plans in *too tenuous, remote, or peripheral a manner* to warrant a finding that the law 'relates to' the plan." *Shaw*, 463 U.S. at 100 n. 21, 103 S.Ct. at 2901 n. 21 (emphasis added).

"There is no legislative history or case law which pinpoints precisely how indirect or remote a state law must be in order to avoid the reach of section 514(a)." *Gould, Inc. v. Pension Benefit Guar. Corp.*, 589 F.Supp. 164, 167 (S.D.N.Y.1984). Gradually, however, a line has emerged between the kinds of state law claims which generally are and are not preempted by ERISA:

> [L]aws that have been ruled preempted are those that provide an alternative cause of action to employees to collect benefits protected by ERISA, refer specifically to ERISA plans and apply solely to them, or interfere with the calculation of benefits owed to an employee. Those that have not been preempted are laws of general application—often traditional exercises of state power or regulatory authority—whose effect on ERISA plans is incidental.

*Aetna*, 869 F.2d at 146. Monarch's claim does not fall into either category, thus restricting the usefulness of existing case law concerning ERISA preemption.

■ The district court, perhaps recognizing the limited utility of case law, focused on the nature and effect of the Sale Agreement. The court concluded the Sale Agreement was a state law contract, not an employee benefit plan:

> The Sale Agreement affects neither the eligibility of the former Des Moines employees for benefits nor the amounts of any of these benefits, it simply divides up the liability for those pension benefits between the two former employers, making the interpretation and enforcement of the Sale Agreement a matter of a "traditional exercise of state power."

Though Section 5 obviously referred to pension benefits under the Monarch and Marquette Plans, the district court found the provision did not alter the "primary

administration" of either plan because the district court only was required to "construe the pension sharing arrangement provisions of the Sale Agreement." Monarch's claim thus was not sufficiently related to an employee benefit plan to require ERISA preemption.

On appeal, the parties string cite a number of cases which they believe support their positions for and against ERISA preemption. Few are helpful. The cases we have found relating even remotely to the facts of this case provide little guidance because in each case the court reached different, fact-specific results. *See e.g., Gould,* 589 F.Supp. at 167 (ERISA inapplicable to dispute between guarantor and PBGC concerning whether guarantor breached pension guaranty contract); *Pension Fund–Mid Jersey Trucking Ind.–Local 701 v. Omni Funding Group,* 731 F.Supp. 161 (D.N.J.1990) (pension fund's contract claim based on its third-party beneficiary status was preempted by ERISA; fund's assigned claims from borrowers, however, were not); *Winstead v. J.C. Penney Co.,* 933 F.2d 576 (7th Cir.1991) (broad ERISA preemption prevented multi-employer health plan from maintaining suit under state law against another, interlocking plan for declaration that other plan was liable for hospital expenses).

One case from this court, however, provides a useful analogy. In *Hospice of Metro Denver, Inc. v. Group Health Ins. of Okla., Inc.,* 944 F.2d 752, 756 (10th Cir. 1991), we held that an action brought by a health care provider against the provider of group health insurance under an ERISA plan was not preempted by ERISA, concluding that "[d]enying a third-party provider a state law action based upon misrepresentation by the plan's insurer in no way furthers the purposes of ERISA." The court's reasoning was based on the distinction between participant and nonparticipant suits:

> An action brought by a health care provider to recover promised payment from an insurance carrier is distinct from an action brought by a plan participant against the insurer seeking recovery of benefits due under the terms of the insurance plan.

*Id.* By analogy, it can be reasoned Monarch's claim against Lone Star is distinguishable from a suit filed by an employee to recover benefits and thus not preempted by ERISA.

Here, the parties do not dispute that certain Monarch employees are entitled to shutdown and other pension benefits which vested after the Sale Closing Date. Nor do they disagree about the amount of benefits owed. The only issue is whether Lone Star or Monarch should pay the portion of benefits attributable to an employee's years of service with Marquette.

Thus, we believe, Monarch's claim does not disturb the administration of a pension plan, calculation of benefits, or determination of entitlement to benefits. Nor does Monarch's claim "affect the 'relations among the principal ERISA entities, the employer, the plan, the plan fiduciaries, and the beneficiaries' as such." *Hospice of Metro Denver, Id.* (citations omitted).

The purpose of ERISA preemption is twofold. First, preemption "protect[s] the interests of employees and their beneficiaries in employee benefit plans." *Straub,* 851 F.2d at 1265 (quoting *Nachwalter v. Christie,* 805 F.2d 956, 960 (11th Cir.1986) (citations omitted)). Second, preemption "ensure[s] that plans and plan sponsors are subject to a uniform body of benefit law ... [by] minimiz[ing] the administrative and financial burden of complying with conflicting directives among States or between States and the Federal Government." *Ingersoll–Rand,* 498 U.S. at 142, 111 S.Ct. at 484 (citations omitted).[5] Here,

---

**5.** ERISA provides a "uniform administrative scheme" for

> determining the eligibility of claimants, calculating benefit levels, making disbursements, monitoring the availability of funds for benefit payments, and keeping appropriate records

in order to. comply with applicable reporting requirements.

. . . .

> A patch-work scheme of regulation would introduce considerable inefficiencies in benefit program operation, which might lead those employers with existing plans to reduce bene-

no "conflicting directives" exist and Monarch's claim does not threaten an employee's entitlement to benefits. Thus, the district court correctly concluded ERISA preemption "would not serve the purpose for which ERISA's pre-emption provision was enacted." *Fort Halifax Packing Co. v. Coyne,* 482 U.S. 1, 14–15, 107 S.Ct. 2211, 2219, 96 L.Ed.2d 1 (1987).

### III.

■ Having concluded ERISA does not preempt state law interpretation of the Sale Agreement, we must next review the district court's interpretation of that instrument. Though both parties agree that Section 5 of the agreement is unambiguous, each argues that its own interpretation of that section should be adopted. The parties essentially disagree about the meaning of the initial paragraph of Section 5, though they use other portions of the section to buttress their positions.[6] The disputed language states:

> *Seller shall retain all liability for benefits accrued to the Closing Date* under the ... Marquette Pension Plan ... based on the ... benefit levels in effect on the Closing Date and the employees' average compensation, Service and Credited Service to the Closing Date.

(emphasis added). Lone Star contends the term "benefits accrued" in Section 5 is a technical term which should be given its ERISA meaning. Under 29 U.S.C. § 1002(23)(A), "accrued benefit" refers to "the individual's accrued benefit determined under the plan ... [and] expressed in the form of an annual benefit commencing at normal retirement age." Shutdown, early retirement and other benefits disputed in this case would not be covered by Section 5 because such benefits are not "normal retirement" benefits.

Lone Star argues, moreover, that it is not liable for any benefits which accrued after the Sale Closing Date because employees did not become eligible for those benefits until after they terminated employment with Marquette. Rather, Lone Star claims it only is liable for pension benefits due to employees who fulfilled the eligibility requirements for a particular benefit *before* the Sale Closing Date.[7] Thus, Lone Star *would not be liable even if* this court concluded that Section 5 was governed by state law because the disputed benefits had not been earned as of the Sale Closing Date. Lone Star also argues that terms used in the Sale Agreement such as "Employee," "Company," and "Credited Service" should be governed by the Marquette Plan.

Monarch responds that the Sale Agreement created "an arrangement whereby each company would pay a proportionate share of the employees' pensions." Under this "apportionment arrangement," Monarch adopted the terms of the Marquette Plan and the two parties agreed to share pension liability for employees who worked for Marquette before being hired by Monarch. Specifically, Marquette agreed to pay a portion of benefits representing the years of service an employee rendered to Marquette prior to the sale of the cement plant, while Monarch would pay that portion of benefits representing the years of service rendered to Monarch subsequent to the sale. Monarch asserts Lone Star "embarked upon a program to change the meaning of Section 5" only after it learned that its pension liability "could increase drastically" if the cement plant shut down.

Based on its characterization of the parties' intent, Monarch argues that the phrase, "Seller shall retain all liability for

---

fits, and those without such plans to refrain from adopting them. Pre-emption ensures that the administrative practices of a benefit plan will be governed by only a single set of regulations.
*Fort Halifax Packing Co. v. Coyne,* 482 U.S. 1, 9, 11, 107 S.Ct. 2211, 2217, 96 L.Ed.2d 1 (1987).

6. The arguments of the parties are prolix. Suffice to say that each party construes paragraphs

2 and 5 of Section 5 (the so-called "bridging" and "indemnity" provisions, respectively) in a light favorable to their interpretation of paragraph 1.

7. In effect, Lone Star only would be liable for certain deferred vested pension benefits which would not become payable until an employee reached age 65.

benefits accrued to the Closing Date," means what it says: "all liability" means "each and every type of liability under the Marquette pension plan, potential or actual"; "benefits accrued" is limited neither to benefits which had vested as of the Sale Closing Date nor to Lone Star's "narrow" ERISA definition, as the Sale Agreement nowhere incorporated ERISA definitions. Rather, Monarch claims, Lone Star is liable for a share of shutdown and other pension benefits [8] accruable under both pension plans proportionate to the number of years an employee worked for Marquette, regardless of whether the benefits had vested (in the sense of being legally cognizable) as of the Sale Closing Date.

The district court's contractual analysis is both illuminating and insightful in the resolution of this issue. As a preliminary matter, the district court noted that Article I, section 2 of the Monarch Plan provided that an employee's years of credited service with Marquette would be added to their years with Monarch for the purpose of determining what type of pension benefit the employee would receive under the Monarch Plan. According to the district court, Monarch and Lone Star agreed that "pursuant to the Monarch Plan and the Sale Agreement," Monarch was to calculate the retirement pension benefit due under its plan and "take a credit" for the amount owed by Lone Star based on the employee's years of service with Marquette. Monarch would then pay the difference to the employee. The parties only now disagree about whether Monarch should get "credit" for certain kinds of pensions which were not "earned" until after Monarch purchased the cement plant.

The district court, having found ERISA inapplicable, applied Kansas law to its contract analysis. The court first determined "the pension sharing arrangement" embodied in Section 5 was "clear and unambiguous." The court then analyzed Section 5 as a matter of law. Confining its inquiry to "the four corners of the Sale Agreement," the court concluded:

> [T]he purpose of Monarch and Marquette in entering into the Sale Agreement was to apportion between themselves the assets and liabilities of the cement plant.... [S]ection 5 of the agreement applies to all pension plan liabilities no matter when the employee became eligible as long as the employee had a combined total of credited service of at least ten years before retiring or being terminated.

Thus, the court reasoned, the phrase "benefits accrued to the Closing Date" did not apply only to pension benefits "earned" or "accrued" in the sense of an employee having met the eligibility requirements of a particular benefit. Rather, it meant Lone Star's proportionate share of pension liability would be calculated as of the Sale Closing Date. We agree.

It makes perfect sense for former and new employers to negotiate a pension sharing arrangement whereby employees are credited for their years of service with the former employer under the new employer's pension plan and yet the new employer is not unfairly made liable for those years of service.[9] This is precisely the kind of "pension sharing arrangement" contemplated by Monarch and Marquette, as witnessed by their incorporation of Section 5 into the Sale Agreement. Both parties gained from

---

**8.** "Rule of 65" benefits involve retirement due to permanent shutdown or layoff, where an employee has met certain age and service requirements. Other benefits under both pension plans included normal, early, "30 [years] and out," "[age] 55 and 10 [years service]," disability, and deferred vested retirement.

**9.** One reason for such a separate agreement may be attributed to the provisions of 29 U.S.C. § 1060(b)(2), which states that when an employer "maintains a plan which is not the plan maintained by a predecessor employer, service for such predecessor shall, to the extent provid-

ed in regulations prescribed by the Secretary of the Treasury, be treated as service for the employer." The Secretary of the Treasury, however, "has promulgated no regulations requiring that a successor employer give credit for years of service with a predecessor employee." *Phillips v. Amoco Oil Co.*, 799 F.2d 1464, 1470 (11th Cir.1986), cert. denied, 481 U.S. 1016, 107 S.Ct. 1893, 95 L.Ed.2d 500 (1987). Thus, "ERISA does not require a successor employer to credit years of service with the predecessor employer where the successor does not maintain the benefit plan of the predecessor." *Id.* at 1471.

the pension sharing arrangement. Monarch agreed to credit an employee's years of service with Marquette under the Monarch Plan. Crediting an employee's years of service undoubtedly allowed for a smooth discord-free transition and work force stability. In exchange, Marquette assumed liability for a share of shutdown and other benefits proportionate to an employee's years of service with Marquette. Moreover, both Marquette and Lone Star understood this pension sharing arrangement, as evidenced by their continued payment of a proportionate share of pension benefits after the Sale Closing Date.[10]

The district court gave three reasons for adopting Monarch's interpretation of Section 5. First, if Lone Star's interpretation were correct, there would be no need for the language in paragraph 2 of Section 5 obligating Lone Star to pay employees a benefit "equal to the aforementioned benefit accrued on the Closing Date, when due under the terms of the ... Plan, *or upon his retirement or termination of employment with the Buyer, if later.*" (emphasis added). This language clearly contemplated payments by Lone Star after the Sale Closing Date. Second, if Lone Star's interpretation were accurate, there would be no need for Section 5 whatsoever. Finally, Monarch's interpretation was consistent with the indemnity provision of Section 5, which stated that a plant shutdown within five years of the Sale Closing Date "may increase the pension liability of the Seller hereby retained." If Marquette did not intend to be liable for pension benefits after the Sale Closing Date, then a plant shutdown "would not 'increase the pension liability of the Seller hereby retained' and there would be no need for such an indemnity provision."

■ We agree with this analysis. Most persuasive is the district court's reasoning that Lone Star's interpretation of Section 5 would entirely eliminate the need for Section 5. Contract interpretations "which vitiate the contract" or reduce its terms to an absurdity should be avoided. *Seacat v.*

*Mesa Petroleum Co.*, 561 F.Supp. 98, 105 (D.Kan.1983). We are persuaded the district court correctly applied state law to the interpretation of the Sale Agreement and the court's construction of the provisions of that instrument was sound and well-reasoned. This conclusion moots the remaining issues raised on appeal.

AFFIRMED.

---

**10.** Lone Star now contends its payments were erroneously made, as it must to remain consistent with its argument regarding the meaning of Section 5.